STATE of Missouri,
Plaintiff-Respondent,

v.

Steven T. FOERSTEL,
Defendant-Appellant.

No. WD 32381.

Missouri Court of Appeals,
Western District.

June 5, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied July 31, 1984.

Application to Transfer Denied Sept. 11, 1984.

William M. Barvick, Jefferson City, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

Steven T. Foerstel (appellant) was jury convicted of nine criminal offenses. The first count was for escape (§ 575.210, RSMo 1978) [1] for which the jury sentenced appellant to 5 years; Count II was kidnapping (§ 565.110, 15 years); Count III was rape (§ 566.030, 15 years); in Count IV he was charged with first degree burglary but found guilty of the lesser included offense of first degree trespass (§ 569.140, 6 months); Count V was for first degree burglary (§ 569.160, 15 years); Counts VI and VII were rape (§ 566.030, 15 years each); Count VIII was kidnapping (§ 565.-110, 15 years); and Count IX was stealing a motor vehicle (§ 570.030, 7 years). The jury thus assessed punishment at a total of one hundred and two years on the various counts. The trial court, finding him to be a persistent offender under § 558.016, added ninety years to his sentence for a total of one hundred ninety-two years.[2]

Appellant raises some seven points of error on appeal (the sufficiency of the evidence is not in question). His points are denied and the judgment of the trial court is affirmed.

The following facts are undisputed. On July 25, 1979, appellant Foerstel was an inmate at the Church Farm, a state correctional minimum security facility, located outside Jefferson City, Missouri. He had been in custody since May, 1972 serving a twenty-five year sentence for rape and a fifteen year sentence for assault with intent to kill. Appellant's job assignment was described as a security clerk on the 3:30 to midnight shift, it involved performing clerical duties and various other tasks for the corrections officers.

Appellant was called to the gatehouse at the front gate several times during the early evening of July 25, 1979 by Kathy Parrant, the guard on duty, to deliver ice water and to capture a tame bird that was loose in the gatehouse. At approximately 10:50 p.m., appellant returned to the gate-house and discovering Officer Parrant in the restroom, went in and asked her if she wanted company—when she attempted to stop he dragged her by the hair out of the restroom. She asked him to stop and think what he was doing, but he replied that he had been in prison eight years and had to get out of there. He forced her to open the front gate and accompany him as he drove away from the prison in Officer Parrant's car. After driving around for about twenty minutes, appellant stoped the car in Memorial Park, in Jefferson City. She was pleading and crying for him to leave her alone but he said it had been eight years and "he was not going to pass up the chance now." Then appellant forcibly raped Officer Parrant. Following the rape, appellant left the car by window so as to avoid turning on the dome light.

In the early morning hours of July 26, 1979, Mrs. Cynthia Chapman awoke and discovered appellant attempting to crawl in her bedroom window. She struggled trying to keep him out of her home but when it became obvious that he was going to gain entry she turned and ran from her home to a neighbor's house where she called the police. Mrs. Chapman stated that during the struggle to keep appellant out of her home she spoke with appellant telling him, "you get the hell out of here," and that he replied that he wanted a drink of water. The police arrived soon after Mrs. Chapman's call and searched her house but appellant was no where to be found. The Chapman house is about one-half mile from the Memorial Park Swimming Pool.

At approximately 7:00 a.m. on the same morning (July 26) seventeen year old Pamela Kanagawa was awakened in her bedroom by appellant putting his hand over her mouth, threatening her with a kitchen knife and telling her not to scream. During the course of the morning appellant forcibly raped both Pamela and her mother

---

1. All statutory references are to Revised Statutes of Missouri 1978.

2. All sentences to run consecutively, except for the six months for trespass which runs concurrently.

Linda. He remained in the Kanagawa house (about one-quarter mile from Memorial Park) for a good portion of the day watching television, allegedly to see if there were any reports on his escape and what actions the police were undertaking. During the course of the afternoon the Kanagawa family was either bound or in the living room with appellant watching television under his observation. About 4:00 p.m., while the Kanagawas were tied up, Pamela managed to free herself but was unsuccessful in an escape attempt. Foerstel forced Pamela to lie in bed with him and told her that he intended to take the family car after dark to make good his escape. He then made her move into the living room with him at which time he removed his clothes and forced her to massage him. While this was happening, appellant heard a noise coming from Mrs. Kanagawa's bedroom and left to investigate. When appellant left the living room Pamela escaped and ran down the street stopped a passing motorist who gave her a ride to a neighbor's house where she called the police. When appellant realized that Pamela was gone he forced Mrs. Kanagawa to drive him away from town in the family car. About 5:15 p.m. Foerstel made Mrs. Kanagawa pull off the road into a wooded area, and they waited there until about 9:30 p.m. when it started to get dark. Foerstel then tied Mrs. Kanagawa to a tree with some panty hose and left the scene in her car. A short time later appellant was captured by State Troopers following a highspeed car chase. The entire sequence of events from escape to capture lasted approximately 24 hours.

## I.

Appellant in his first point attacks joinder of the offenses under present Rule 23.05 (formerly 24.04(b) [3] and asserts error in the exercise of discretion under Rule 24.07 [4] by not severing the offenses for trial. Appellant argues the entire episode should have been severed into three categories or transactions, one comprising Counts I through III which encompassed the escape, kidnap and rape of the guard, a second for the Chapman crime (Count IV), and a third for the rapes, car theft and kidnapping involving the Kanagawas (Counts V through VIII). Appellant states the crimes and victims were different, they were separate in time and location and could conceivably only be joined as part of a "common scheme or plan" under Rule 23.05. The state agrees the nine offenses did not comprise the "same transaction" language of the rule. The primary cases supporting his position of improper joinder and error for not severing are listed as follows:

In *State v. Prier*, 561 S.W.2d 437 (Mo. App.1978), three sales of different substances over a two month period to the same officer was held to be an improper joinder. The Southern district noted the Federal Rule on joinder (F.R.C.P. 8(a) is much broader than Rule 24.04 (now 23.05). It noted the "common scheme or plan" language was introduced in Missouri in

---

3. Rule 23.05 was amended, effective January 1, 1982, after the trial in this case. The language of the Rule has remained the same and reads as follows: "All offenses that are based on the same act or on two or more acts that are part of the same transaction or on two or more acts or transactions that constitute parts of a common scheme or plan may be charged in the same indictment or information in separate counts." (Adopted June 13, 1979, effective January 1, 1980; amended May 18, 1981, effective January 1, 1982.) Prior to former Rule 24.04 a defendant could not be convicted at the same trial of two distinct felonies. *State v. Terry*, 325 S.W.2d 1, 5 (Mo.1959). *But State v. Baker*, 524 S.W.2d 122 (Mo.banc 1975) held 24.04 constitutional where within its limiting language two separate offenses could be tried. *See also State v. Duren*,

556 S.W.2d 11 (Mo.banc 1977), reversed on other grounds sub nom, *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) and *State v. Pittman*, 569 S.W.2d 277, 279 (Mo.App. 1978). The language of former Rule 24.04 and present 23.05 is substantially all the same. The entire history of the rule in this state is set out in the footnotes in *State v. McCrary, infra,* 621 S.W.2d at page 270.

4. Rule 24.07 reads as follows: "When a defendant is charged with more than one offense in the same indictment or information, such offenses may be tried jointly or separately in the discretion of the court." (Adopted June 13, 1979, effective January 1, 1980).

1971. This language maintained consistency with the evidentiary rules that prohibit separate and distinct crimes being introduced to establish a defendant's guilt for the charge he is being tried for except when evidence of other crimes tends to establish (1) motive; (2) intent ... (4) a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other. *State v. Selle,* 367 S.W.2d 522, 529 (Mo.1963). The facts in *Prier* were described as "independent," "unrelated," "impromptu" and "casual," not of a single motive, happening at different times and places, the proof of each not tending to prove any material fact of the other two charges. *Id.* at 440, 411.

In *State v. Jackson,* 566 S.W.2d 227, 228–229 (Mo.App.1978), the defendant was charged with murder and at the time of his arrest with possession of heroin. The state failed to connect the two crimes as part of the same transaction and showed no common scheme. Since the state did not introduce evidence to corroborate its theory that the victim had previously fought with the defendant over the sale of drugs, the court held the crimes were independent and should have been tried separately under Rule 24.04 (now 23.05).

This court in *State v. Buford,* 582 S.W.2d 298, 301–302 (Mo.App.1979), held that an assault and theft from a victim of her car keys followed by an assault a short time later on another nearby victim was improperly joined because proof of the second assault was not necessary to or "inextricably woven" with proof of the first assault, no common scheme was shown and even though the defendant was acquitted of the first assault the court held the joinder of the two constituted prejudicial error.

In *State v. Howard,* 601 S.W.2d 308, 309–310 (Mo.App.1980), the defendant stole within an hour's time purses from two different people several blocks apart. As in *Buford, supra,* the defendant was found not guilty of the first charge, but, the court found prejudicial error because neither offense was part of the same transaction or part of a common scheme, the joinder therefore amounting to error.

In *State v. Wood,* 613 S.W.2d 898, 901–902 (Mo.App.1981), the defendant and another were charged with robbing two motels within one half hour of each other. There was no evidence of a common scheme or plan nor was proof of the second robbery necessary to prove the first robbery, resulting in reversal.

It should be again noted the appellant does not deny commission of the offenses but points to diminished mental capacity or mental disease and defect (as discussed in Part II of this opinion) in conjunction with his being apprehensive over pending parole hearings and his having been recently denied two furloughs. The state contends the three transactions are sufficiently interrelated and part of a common scheme or plan to escape confinement and evade police. The rape of the guard and the rapes of the Kanagawas could arguably be part of or incidental to such plan or motive to escape and while evading police to engage in as much sexual activity as possible, because, to paraphrase appellant's conversation with the guard, he had been in prison and had not had sexual relations for eight years and was not going to pass up a chance while he was out.[5]

In *State v. Brannom,* 539 S.W.2d 747, 749 (Mo.App.1976), the court said former Rule 24.04 (now Rule 23.05) is designed to encourage the joinder of offenses in the interest of efficiency and the administration of our criminal justice system. The Rule should not be so narrowly construed as to defeat its purpose. *Pittman, supra,* footnote 4 at 280.

In *State v. Johnson,* 505 S.W.2d 11, 12 (Mo.App.1974), the Eastern District held a car stolen by the defendant from one victim and used by him in the robbery of another an hour later to be properly joined (held to

---

**5.** The testimony of the victims as to the offenses is not repeated in this opinion due to the sordid and embarrassing nature of the evidence.

be the same transaction). The two offenses were separated in the presentation of evidence to the jury allowing them to distinguish, without prejudice to the defendant between the offenses. After *Johnson, supra,* and after this court's opinion in *Buford, supra,* the Eastern District reaffirmed *Johnson* in that offenses may be properly joined when they are so closely related in time and purpose that they are part of the same transaction. *State v. Callies,* 588 S.W.2d 18, 19–20 (Mo. App.1979); *State v. Ross,* 611 S.W.2d 296, 298 (Mo.App.1980). In *Callies,* the defendant was charged with escape and then within an hour theft of an automobile. Like *Johnson* this was held to be part of the same transaction, and severance being discretionary, the case was affirmed. In *Ross,* the defendant, a hitch-hiker, stole a car and money and when stopped by police 45 minutes later he tried to run over them with the car. This was held to be the same transaction and affirmed based on *Johnson.*

In *State v. Mack,* 576 S.W.2d 550, 552 (Mo.App.1978), the defendant had fraudulently been paid for allegedly moving people over a period of three years. The court held that even though the dates, address and victims were different the offenses constituted a common scheme or plan. Where the cautionary MAI–CR 2.70 (now MAI–CR2d 2.70) instruction was given limiting consideration of evidence to each count, there was held to be no abuse of discretion in not granting severance.

The defendant in *State v. Pittman, supra,* robbed and assaulted a female victim in a rest area. A short time later a trucker trying to keep defendant from escaping the rest area was assaulted. These offenses were held to be authorized for joinder at trial under then Rule 24.04.

In *State v. Robinson,* 591 S.W.2d 18, 20 (Mo.App.1979), the defendant was charged with murdering a victim and taking his car. An hour later while driving the car a policeman attempted to arrest him for a traffic offense. The defendant shot him, giving rise to Count II. The court held that the two crimes were properly joined as part of a continuation of criminal activity under Rule 24.04 (now Rule 23.05). The court noted the jury had acquitted him of the murder charge thus showing it distinguished between the offenses making any prejudice seem unlikely.

A common scheme or plan was found to uphold joinder in *State v. Decker,* 591 S.W.2d 7, 9–10 (Mo.App.1979). The defendant stole a car at 4:00 in the afternoon then used it to rob a grocery store at 9:00 p.m. The court, relying on *Johnson, supra,* states that joinder is to be encouraged for the efficiency of the criminal justice system, but notes from *Duren, supra,* any benefit should be weighed against potential prejudice to defendant. In assessing the potential prejudice the court should consider (1) number of offenses charged (2) the complexity of the evidence, and (3) the ability of the jury to distinguish the evidence and apply the law intelligently as to each offense. Although acquittal on one count might alert a reviewing court to the possibility of improper joinder, surgical excision of that count from a multicount submission should reassure the court that the jurors listened to, considered and followed the trial court's instructions. Reversal should result only upon a clear showing of prejudice and abuse of discretion in not granting severance. In *Decker* the scheme or plan to use the stolen car in the robbery did not result in prejudice under the three-pronged test of *Duren.* There was little chance for confusion by the jury. The charges were distinct, the facts were simple and easily separated. There was no overlap in the testimony of the witness. (One witness testified on the car theft, four witnesses on the grocery robbery).

Our Supreme Court next addressed this area in *State v. Williams,* 603 S.W.2d 562, 566–568 (Mo.1980), where the accused was convicted of rape, sodomy, kidnapping and stealing a motor vehicle from the same victim. This was held to be properly joined because the offenses were intertwined in time, place and purpose. On the issue of severance the court again recognized the

test of prejudice in *Duren* while noting that the motion to sever is addressed to the sound discretion of the trial court. "Severance may be granted even where the joinder is authorized, but the party must show prejudice" (citation omitted). *Id.* at 567. In this case the appellant claimed prejudice because the evidence of each offense tended to indicate guilt as to the other offenses. The court dispelled any prejudicial effect of evidence of other crimes, because there was a continuous transaction and that it could have been introduced even had there been separate trials on each offense, thus depriving the defendant of any claim of prejudice.

In a Rule 27.26 motion the movant in *Sneed v. State*, 615 S.W.2d 658, 659 (Mo. App.1981), raised the joinder and severance question in a trial that proceeded on three counts, two of which were reversed on appeal. The evidence showed movant had, prior to the robberies, told another defendant that he wanted "to go out and make some money." The series of robberies were held to be part of a common scheme.

Two separate drug sales to two separate officers were made, charged and tried in *State v. Shive*, 621 S.W.2d 715, 716 (Mo. App.1981). In relying primarily on *Decker* and *Williams*, supra, the court held there to be no clear showing of prejudice on the motion to sever. This was held to be a continuous transaction, therefore the evidence of the two sales could be introduced at a separate trial or at a single trial without prejudice.

In *State v. McCrary*, 621 S.W.2d 266, 271–272 (Mo. banc 1981) (per Welliver, J., with two Justices concurring, and two dissenting), the defendant was tried on four counts which included assault with intent to kill with malice occurring on November 13, 1978 (Count I), arson and assault on March 9, 1979, (Counts II and III), and carrying a concealed weapon on March 9, 1979 (Count IV). The victims of all these offenses were live-in friends of the accused's former girlfriend and the two children were born of the relationship between the accused and former girlfriend. After threats and calls to the children's mother over an extended period of time shots were fired into the house on one occasion and the house was fire bombed. The appellant complained of improper joinder and failure to sever. The court held "[a] common scheme or plan by its very definition presupposes that it involves a series of separate transactions or acts. * * * We find that the essential test in determining whether a common scheme or plan exists, in a case involving a single defendant acting alone, is the requirement that all the offenses charged must be products of a single or continuing motive." (Citation omitted). *Id.* 271. The court held the joinder of the separate offenses was proper as they were "[t]he product of the single, continuing motive of revenge by harrassment for the loss of his paramour and children." *Id.* at 271. The court held there was ample evidence of this plan of harrassment and revenge aimed at the family. On the issue of severance the court held there to be no requirement to sever after it has been determined that joinder is proper. Severance is discretionary with the trial court to counter prejudice in order to achieve a fair result. In applying the test of prejudice of *Duren*, supra, the court found the evidence was not complex, the criminal acts occurred at distinctly different times and the jury could intelligently distinguish the law and evidence on each offense as instructed by MAI–CR2d 2.70. Although the jury assessed punishment at life on the first count and 15, 30 and 5 years on the remaining counts, the court held the penalties were not excessive under the circumstances.

The offenses in the case at bar point to acts constituting parts of a common scheme or plan. Rule 23.05. Appellant's escape, burglary, the kidnappings and theft carried out his intent to stay at large outside prison walls. The three rapes committed in the 24 hours spent outside the Church Farm were incidental to and part of his plan as espoused to the guard that he had been without a woman for eight years and wasn't going to pass up any sexual activity. Add to the claim of depression

and frustration over being denied his second furlough request and it can be concluded the rapes and all other offenses were committed in a continuous flow of events evidencing a common scheme or plan. It is not felt the rapes are so attenuated as to comprise offenses not properly joined as part of this scheme or plan from the rest of the offenses. The rapes were products of appellant's continuing dual motive to engage in as much sexual activity as possible outside of confinement and to effect his permanent escape. *McClary, supra, Sneed, supra.* Joinder of the nine offenses was here proper. Rule 23.05.

The next question is whether Judge Barnes erred in not severing the offenses into three separate trials as proposed by appellant. "Reversal of the trial court is proper only upon a clear showing of prejudice and abuse of the trial court's discretion." *Decker, supra,* at 10. Rule 24.07 makes severance a discretionary act. The determination that the jury looked through the evidence and considered each charge separately is borne out by the fact that it reduced one of the burglary charges to first degree trespass. This action by the jury shows the facts of the case not to have been too complicated, allowing the facts to be distinguished as to each offense. The court gave MAI–CR2d 2.70 which instructs the jury to consider separately each offense and the evidence and law applicable to it. *McCrary, supra, Robinson, supra, Decker, supra.* The number of offenses here were not so great as to have confused the jury. *Duren, supra.* The punishment here is not excessive under the circumstances. *McCrary, supra.*

A common scheme or motive being present, much of the evidence of the different offenses would have been admissible without prejudice to the defendant at three separate trials. *Williams, supra, Shive, supra.* Although the evidence of each of the three transactions was not necessary to prove the others, *Buford, supra, Wood,*

*supra,* the introduction likewise would not be prejudicial. Violence is not here done to the *Prier, Buford, Howard, Wood* and *Jackson* cases—they differ factually from this case in that they contained no evidence connecting the offenses together to form part of a common scheme or plan or a continuing motive. The common law evidentiary rule and the rule dealing with joinder deal with different questions, making "wholesale importation of the evidentiary rule into the law dealing with joinder inappropriate." *McCrary, supra,* at page 271, n. 7. *McCrary* holds that any prejudicial impact of related offenses is to be taken up in the severance question once joinder has been deemed proper. Under the facts of this case no error was committed in denying the motion to sever as there was no showing of prejudice to appellant.

Under Rule 23.05 that encourages, but does not make mandatory, joinder of criminal offenses so long as they are a part of the same act, same transaction or series of transactions, or a part of a common scheme or plan,[6] if such joinder does not result in prejudice to the accused, it need not be severed, *Williams, supra, Decker, supra.* The case of *State v. McCrary* points toward joinder and trial of cases such as this. The question of prejudice is the variable that will protect criminal defendants. For appellant where no question is made as to the sufficiency of the overwhelming evidence against him. Where the jury did not return a verdict on the burglary charge in the Chapman matter (for which 15 years punishment had been assessed on the Kanagawa ordeal) but rather a verdict on the lesser offense for trespass, with only 6 months punishment, it is hard to see how the splitting of this matter into three trials would have helped appellant.

Appellant's first point is ruled against him.

### II.

Appellant's second, third and fourth points are consolidated here for the sake of

---

6. *See McCrary, supra,* in footnote 5, page 271, which reads, "2 American Bar Association, Standards for Criminal Justice 13–1.2 (2d ed. 1980)

states: 'Two or more offenses are related if they are based upon the same conduct, upon a single criminal episode, or upon a common plan.'"

brevity and present a common question: Whether prejudicial error resulted from the trial court's refusal to submit to the jury appellant's defense of not guilty by reason of mental disease or defect. Appellant's specific contentions are that the form instruction on this defense, MAI–CR2d 2.33, was not submitted (Point II); that a related instruction advising the jury of the consequences of such a verdict, MAI–CR2d 3.72, was refused (Point III); and that no verdict forms were provided the jury for this defense (Point IV). These points are ruled against him.

In order to establish a legally sufficient defense of not guilty by reason of mental disease or defect appellant must demonstrate (1) that he had a "mental disease or defect;" and (2) that as a result of such mental disease or defect "he did not know or appreciate the nature, quality or wrongfulness of his conduct or was incapable of conforming his conduct to the requirements of law. Section 552.030.1. The burden of proof is on the defendant at trial to produce *substantial evidence* as to these two elements, and if he fails to do so there is a conclusive presumption of sanity. Section 552.030.7. *See also State v. Williams*, 521 S.W.2d 169, 171 (Mo.App.1975).

■ The appellant's *sole expert* witness at trial on this issue was a psychiatrist, employed by the State Department of Mental Health, who conducted a psychiatric evaluation of the appellant. The psychiatrist testified that the appellant had "dissociative neurosis" at the time of the various crimes, which is a dream-like state brought on by stressful situations. The doctor also stated that at the time of the examination "even though he (the appellant) knew and appreciated the nature, quality and wrongfulness of the alleged crime, he could not conform his conduct to the requirements of law because of the trance-like or dream-like state." However, on cross examination the doctor was asked point-blank, "is it your opinion that the defendant does not suffer

from a mental disease or defect," his answer was, "yes, sir." [7]

The following rendition of the doctor's testimony is provided to demonstrate the appellant's failure to produce substantial evidence that at the time of the crimes, he suffered from a mental disease or defect and as a result did not know or was incapable of conforming his conduct to the requirements of the law. Dr. Parwatikar's examinations and inspection of case records in late January and early February of 1980 showed the appellant had problems both at home and school from age 13. His mother, toward whom he had made sexual advances, felt him to be bizarre. He left rooms through windows, was abused by his father, had witnessed a sexual orgy, and was jealous of siblings. After release from the army he took drugs until he was sent to prison for a crime for which he allegedly was not a suspect. While in prison he received psychiatric treatment. The doctor's opinion was that all these symptoms were consistent with a dissociative neurotic person who escapes reality, without remembering anything, when in a stressful situation. The doctor's general observations were that appellant was anxious and depressed, fearful, and reluctant to talk about his mother, all of which were "appropriate" to the "predicament ... he was in." The doctor determined he established a relationship with a female social worker during his present prison stay; the denial of two furloughs caused him to be tense, frustrated and fed in to his feelings of failure and not living up to expectations. This dissociative neurosis was not present at the interviews. The appellant could remember very little of the facts concerning the events for which he was charged. The doctor described this neurosis as a dream-like state such as a sleepwalker resulting in a different personality, one lacking the ability to form a necessary intent or state of mind. The doctor said, "this particular neurosis is a factor of personality," and the

---

7. The appellant's motion to "correct the record" which asks this court to change the answer of the doctor to reflect a negative answer or to add to the question the word "now" between the words "not" and "suffer" is denied.

"condition" is ongoing and will recur—that at the time of the interviews he was ok but when it did again occur it would not be treatable.

Nowhere in the doctor's testimony did he give an opinion that at the time of the occurrences the appellant suffered from a mental disease or defect. The use of such terms as "neurotic state," "fugue-like" or being out of touch with reality, without more, and without a showing of being present at the time of the crimes will not, without more, constitute error for the failure to submit this defense. The record is quite unclear on this point—however in the appellant's yeomanlike effort (his counsel on appeal has represented him very well) to correct the record there is in the proffered affidavit of the doctor a sentence which says at the time of the examination the appellant suffered from a dissociative disorder, "which under DSMIII is a mental disease." Nowhere in the trial testimony of the doctor was he asked or did he give an opinion directly focusing on whether the appellant suffered a mental disease or defect, as defined in Section 552.010, the result of which made him during the crimes incapable of conforming to law. Section 552.020.3(4). If the legislature had not intended that a person must show the conduct resulted from a mental disease to establish the defense it could have merely used the second requirement of inability to conform as the basis for submission. Simply stated no opinion was set forth stating the dissociative neurosis of the appellant was a mental disease.

Thus, the appellant failed to establish a key element of his defense of not guilty by reason of mental disease or defect, failing to establish the first element of the defense; proof to support the second element, therefore, need not be examined. The testimony of the doctor did not constitute substantial evidence of a mental disease or defect under Section 552.030.1. The trial court properly refused appellant's offer of instructions on the above defense, holding that "as a matter of law the evidence in this case does not support the giving of these instructions." *See State v.*

*Vansandts,* 540 S.W.2d 192, 204–205 (Mo. App.1976); and *State v. Williams, supra.*

Appellant also fails to establish how he was prejudiced by the exclusion of the defense of not guilty by reason of mental disease or defect, when the jury *was* submitted, and *refused* to find, the defense of diminished mental capacity (MAI–CR2d 3.74, Section 552.030.3), a less stringent mental defense. This defense is entirely separate from the defense of not guilty by reason of mental disease or defect and is much less difficult for appellant to meet, since only a particular intent need be negatived rather than the appellant's responsibility for his actions. Under this defense a finding of mental disease or defect would permit the jury to conclude that appellant was unable to form the necessary specific or general intent and to thereby acquit him of the offense charged (although he could still be convicted of a lesser charge). *See State v. Strubberg,* 616 S.W.2d 809, 813 (n. 2) (Mo.banc 1981); *State v. Anderson,* 515 S.W.2d 534, 537–542 (Mo. banc 1974). Where, as here, the jury refused to find applicable the less stringent defense of diminished capacity, it could not possibly have found for appellant on the more stringent mental defense of not guilty because of mental disease or defect. There was thus no prejudicial error in the court's refusal of appellant's instructions.

### III.

Appellant's fifth point contends that the trial court erred in enhancing his punishment under the persistent and dangerous offender provisions of § 558.016. This point is raised for the first time on appeal, never being raised by objection or in appellant's Motion for New Trial, and is thus reviewable only for determination of the presence of manifest injustice under plain error, Supreme Court Rule 29.12(b). *State v. Miller,* 604 S.W.2d 702, 705–709 (Mo. App.1980). This point is ruled against him.

The prosecution introduced evidence at trial of two prior felony convictions of appellant, one for rape (guilty plea

entered May 2, 1972), for which appellant was sentenced to 25 years imprisonment, and one for assault with intent to kill (guilty plea entered June 1, 1972) for which appellant received a 15 year sentence to run concurrently. This evidence was properly presented to the jury as it was an essential element of the escape charge. At the hearing following the trial, pursuant to § 558.016, the same convictions were again introduced by the state and appellant failed to raise objection. The court properly found appellant to be a persistent offender based upon the evidence. The appellant mistakenly argues that since the jury had before it all of the relevant information that was available to the trial court including the prior convictions, it should have had the final say as to sentencing. This theory is expressly refuted by the language of the statute which states:

"*The court may sentence* a person who has pleaded guilty or has been found guilty of a Class B, C, or D felony *to an extended term* of imprisonment *if it finds* the *defendant* is a *persistent offender* or a dangerous offender." Section 558.016.1 (Emphasis added).

It is thus clear from the language of the statute that the determination of whether or not a defendant is a dangerous or persistent offender is up to the court, not the jury and the enhancement of sentence upon such a finding is also within the sound discretion of the court.[8]

### IV.

Appellant's sixth and seventh points of error have been combined here for the sake of brevity. Appellant contends that manifest injustice was committed in permitting the prosecution to argue that self-serving statements made by appellant during psychiatric evaluation were false, because these statements were purportedly made under sodium amytal ("truth serum") and were therefore true. Appellant also ar-

gues that video tapes taken of his interview with the psychiatrist while under the influence of sodium amytal were erroneously kept from the jury, as were any references to the use of sodium amytal.

The above points are ruled against appellant.

The claim that the prosecution acted improperly in arguing to the jury that statements made by appellant were self-serving is raised for the first time on appeal; appellant having failed to raise it by objection during trial or in his Motion for New Trial, it is reviewable only for plain error. *State v. Murphy,* 592 S.W.2d 727, 732 (Mo.banc 1979); Rule 29.12(b).

■ Prior to trial, appellant attempted to introduce a video tape of an interview by a psychiatrist with appellant while appellant was under the influence of sodium amytal. The trial court correctly excluded this evidence and prohibited any reference to a sodium amytal interview. Interviews under "truth serums" are not admissible under Missouri Law. *State v. Hudson,* 289 S.W. 920 (Mo.1926). Appellant now complains that the prosecution's argument, (which allegedly cast aspersions on the veracity of appellant), was improper as the prosecutor knew that appellant was under the influence of truth serum and thus appellant's statements had to be truthful.

■ There are several defects in appellant's argument. First of all there is no evidence in the record on appeal that all of the three interviews by the psychiatrist were conducted while appellant was under the influence of "truth serum". The record appears to indicate that only one of the three interviews was conducted making use of sodium amytal. Thus, there is no support for appellant's assertion that his statements which were challenged by the prosecution were made under sodium amytal. The state correctly notes that appel-

8. Appellant had no constitutional right to jury sentencing in the first place, and there is no constitutional or legal principle which prevents the trial court from determining whether the jury sentences were appropriate in light of the

crimes. *See Payne v. Nash,* 327 F.2d 197, 200 (8th Cir.1964); *Turnbough v. Wyrick,* 551 F.2d 202, 203 (8th Cir.1977), *cert. denied,* 431 U.S. 941, 97 S.Ct. 2658, 53 L.Ed.2d 260 (1977).

lant could have, but did not develop this matter by an offer of proof and thus no basis for reversal exists even if the prosecution's argument was erroneous. *See State v. Gant,* 586 S.W.2d 755, 766 (Mo. App.1979); *State v. Hatten,* 561 S.W.2d 706, 713 (Mo.App.1978).

Appellant's argument again fails when he asserts that the state's argument was improper. The gist of appellant's attack is that the prosecution's argument was unfair because appellant was precluded from informing the jury that the interview was allegedly made under truth serum and that all statements of the appellant were thus truthful. The Missouri Supreme Court has expressly stated that sodium amytal (and other "truth serum") interviews *are not* a *reliable* means of determining truth. *State v. Hudson, supra.* Any reference by appellant to the use of sodium amytal as purportedly establishing the reliability of his statements would have been irrelevant, improper and inaccurate. The state was by law entitled to argue the evidence from its own viewpoint, and had the right to address the truthfulness of witnesses. *State v. Murphy,* 592 S.W.2d 727, 733 (Mo. banc 1979); *State v. Heinz,* 607 S.W.2d 873, 880 (Mo.App.1980).

The inadmissibility of "truth serum" examinations as established in *Hudson* also defeats appellant's seventh point which alleges trial court error in excluding a video tape of appellant's interview while under the influence of sodium amytal. The appellant produced no authority at trial and offers none here, to support the proposition that "truth serum" examinations are generally considered reliable and accurate by the scientific community. The above standards governs the admissibility of scientific test results and expert opinions based on them in Missouri. *State v. Johnson,* 539 S.W.2d 493, 501 (Mo.App.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). The trial court thus did not err in following the controlling Missouri case law on these items.

The judgment is affirmed.