**STATE of Missouri, Respondent,**

v.

**Theron Reed ROLAND, II, Appellant.**

**No. WD 40883.**

Missouri Court of Appeals,
Western District.

March 12, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 1991.

Application to Transfer Denied
June 11, 1991.

David S. Durbin, Appellate Defender, Terri L. Backhus, Asst. Appellate Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Geoffrey W. Preckshot, Asst. Atty. Gen., Jefferson City, for respondent.

Before NUGENT, C.J., and ULRICH, J., and WASSERSTROM, Senior Judge.

NUGENT, Chief Judge.

The defendant, Theron Reed Roland, II, appeals his conviction for the first degree murder of Steven Newberry, the sentence of life in prison without eligibility for parole, and the denial of his postconviction motion for relief in which he claimed ineffective assistance of trial counsel.

In the first of his two points on appeal the defendant argues that the trial court erred in refusing to permit a scholar of the occult to testify about the effects of satanic beliefs on individuals. His second point addresses his claim that the hearing court erred in denying his motion for postconviction relief in which he asserted that his trial counsel used drugs while working on the case. We affirm the judgments of both the trial and the hearing courts.

Testimony at trial showed that defendant Roland's parents came from family backgrounds saturated with violence, sexual abuse and alcohol abuse, all of which they brought into their own marriage and family life. According to defense psychiatrist Dr. William S. Logan, the defendant's father, an alcoholic, sexually abused his daughter and physically abused his wife and son. Mrs. Roland, because of depression, often remained aloof from the boy.

During his early childhood, the defendant's parents separated and his father entered a psychiatric hospital. Reports of abuse reached the state's Division of Family Services, which removed the defendant and his sister from their mother's custody and placed them in foster homes for several months. The family with whom the defendant lived punished his bed-wetting and other manifestations of dysfunction by physical abuse that included rubbing his nose in his urine.

He and his sister returned to his mother's home, where, in his early school years, he slept in his sister's bedroom out of a fear of sleeping alone. According to Dr. Logan, his mother, in pursuit of a husband, frequented taverns until the early morning hours, leaving her children unattended. Meanwhile, his father remarried and had another son, which, according to the psychiatrist, the defendant perceived as rejection.

When the defendant reached age twelve, his mother married a man whose three older boys all excelled in school. Defendant Roland, however, did poorly in school and gradually developed a reputation as the "class clown," someone who would do anything to gain the acceptance and approval of his peers. He began drinking by the seventh grade, graduated to daily marijuana use as a high school freshman and later in high school used other drugs, including amphetamines, cocaine and hallucinogens. As a sophomore, he vandalized property.

His family life remained unhappy. As a child, he felt that no one cared for him, a perception that apparently continued into adolescence, augmented by the hostile rela-

tionship that developed between him and his stepfather.

During the first part of his junior year in high school, the defendant had a brief respite, spending that time with a paternal uncle, a farmer, who gave him a disciplined but loving family life. His academic performance skyrocketed, he joined the school wrestling team and "for the most part" stopped using drugs. His uncle's heart disease led to the defendant's return to his mother's home, where he quickly resumed his former ways. He increased his interest in heavy metal music, having first heard the music in the eighth grade under the tutelage of one of his stepbrothers. That interest, according to Dr. Logan, became an obsession. The music, which included the works of Ozzy Ozbourne and the group, "Megadeath," usually contained themes that advocated sexual and other forms of physical violence and excoriated established authority. The combination of drugs and the music resulted in bizarre hallucinations, such as the reflection in a mirror of an "evil" face that he had made supposedly remaining there after he had changed his expression. Where no one spoke, he heard voices. Enter now the defendant's own Mephistopheles, James Hardy, who later led the fatal attack on Steven Newberry.[1] James, a successful student, professed belief in Satan and satanism and began to show a special interest in the defendant. Accepted for the first time by a popular peer, the defendant responded by first seeking James' approval and by idolizing his popular schoolmate. According to Dr. Logan, the defendant believed that James' success, such as his election as senior class president, stemmed from powers that Satan had given him. Thus, defendant joined in the worship of Satan, hoping for similar results—success and popularity.

His practice of satanism included self-mutilation. He also frequently tortured and killed small animals, returning now and then to worship near their decomposing bodies by playing heavy metal music and chanting prayers. Occasionally, other youths joined in the rituals, but eventually, a "core" group developed, consisting of the defendant, James Hardy, Steven Newberry, and Ronald Clements, who also joined in the Newberry murder.[2]

In the autumn of 1987, James Hardy decided that he, the defendant and Ronald Clements should sacrifice the hapless Steven Newberry to Satan. Transportation problems foiled one attempt on his life on Halloween; in November the defendant's refusal to strike the first blow aborted another. Finally, on December 6, the victim and his three would-be killers drove in the defendant's car to an isolated well in Southwest Carl Junction. There, they suspended a cat from a tree, beat it to death with baseball bats provided by the defendant, and tossed it into the well.

The three other youths then began to beat Steven, with James striking the first blow. During the beating, the victim cried, "Why me?" Ronald answered, "Because it's fun." Steven tried to run away, but tripped; the others caught him and clubbed him to death. They then bound his hands with twine, weighted his body with a stone, and dumped him into the well. They hid the bats in nearby brush.

According to Dr. Logan, defendant Roland believed that this human sacrifice would cause Satan to appear to them and perhaps possess them or otherwise give them supernatural powers. After the murder, however, he felt empty, sensing none of the frenzied thrill that he had felt during the killing ritual. Thereafter, according to Dr. Logan, he began to feel remorse and fear.

After a December 7 telephone call from Steven's mother, concerned that her son had not yet returned home, police questioned the three youths, took statements from James Hardy and Ronald Clements, and retrieved the victim's corpse from the

1. James pleaded guilty to a charge of first degree murder and received a sentence of life imprisonment without eligibility for parole.

2. The Missouri Court of Appeals reversed Ronald's conviction and remanded the case for a new trial. *State v. Clements*, 789 S.W.2d 101 (Mo.App.1990).

well. On December 8, they arrested the defendant, who confessed and took them to the scene of the murder, showed them the bats and recreated the crime for a videotaped recording.

The defendant obtained a change of venue to Pettis County, where he went on trial June 14, 1988. His counsel mounted a statutory defense of mental defect or disease. § 562.086.1.[3] He sought to introduce the testimony of Carl Raschke, Ph.D., a professor of religious studies with a specialization in the occult. In his offer of proof, defense counsel moved to allow Mr. Raschke to testify that satanists abhor everything that Judeo–Christian morality deems good, and deem good everything Judeo–Christian morality abhors. He further offered to prove that the witness would testify that defendant Roland had become so coerced by satanism that he could not distinguish between good and evil and, therefore, did not understand the qualitative nature of his actions in murdering the victim. The court permitted witness Raschke to testify to the general tenets of satanism, but, because he lacked any training in psychiatry or psychology, excluded his proffered testimony as to the effects of satanic beliefs on individuals. The professor did testify that satanic cults often employed violence and terror in enforcing secrecy and loyalty among their members.

Immediately before witness Raschke took the stand, Dr. Logan testified. Father James Lebar, a Catholic priest and a consultant to the Archdiocese of New York on satanism, testified immediately after the professor appeared. Father Lebar divided satanic groups into four categories, ranging from the "dabblers," such as the youths involved in this case, to the most violent satanists, who often "murder for Satan." He explained, however, that even dabblers can become frenzied enough to kill others or themselves as sacrifices. Joseph Stuessy, a musicologist, testified to the lyrics of some heavy metal songs advocating violence and referring to Hell.

Rejecting defendant Roland's defense, the jury found him guilty of first degree murder and recommended a sentence of life imprisonment without eligibility for parole. The court imposed that sentence.

The defendant sought postconviction relief under Rule 29.15[4], contending that he had received ineffective assistance of trial counsel owing to counsel's use of drugs during the trial. The hearing court denied his motion on January 19, 1990.

In addressing Mr. Roland's first point on appeal, we employ the standard of review employed in cases involving the admissibility of expert testimony, a question left to the sound discretion of the trial court. An appellate court will not disturb the trial court's ruling absent a clear abuse of discretion. *State v. Marks*, 721 S.W.2d 51, 55 (Mo.App.1986). Abuse of discretion means an untenable judicial act that defies reason and works an injustice. *State v. Williams*, 643 S.W.2d 3, 4 (Mo.App.1982), *citing State v. Stubenrouch*, 499 S.W.2d 824, 826 (Mo. App.1973). When the trial court's ruling clearly offends the logic of the circumstances or when it becomes arbitrary and unreasonable, the appellate court will find an abuse of discretion. *State v. Marks*, *supra*, citing *Mathews v. Chrysler Realty Corp.*, 627 S.W.2d 314, 318 (Mo.App.1982).

The law presumes all adults responsible for their actions, *State v. Thomas*, 625 S.W.2d 115, 124 (Mo.1981), *State v. Foerstel*, 674 S.W.2d 583, 591 (Mo.App. 1984), § 552.030.6, and requires a defendant to produce substantial evidence to rebut that presumption of sanity. *Thomas*, *supra*; *Foerstel*, *supra*; § 552.030.6. Resolution of the question of an accused's sanity lies with the trier of fact. *State v. Carr*, 687 S.W.2d 606, 609 (Mo.App.1985); *State v. Bradshaw*, 593 S.W.2d 562, 568 (Mo.App.1979); § 552.030.6.

Section 562.086.1 absolves a person of responsibility for criminal conduct if "as the result of mental disease or defect" that person "did not know or appreciate the nature, quality or wrongfulness" of the

---

**3.** All sectional citations refer to Missouri Revised Statutes, 1986.

**4.** Missouri Rules of Court (1991).

criminal act or could not behave in accordance with the requirements of law. The statute establishes a two-prong test, requiring that the defendant first prove the existence of a mental disease or defect and then prove a lack of knowledge or appreciation of the quality or wrongfulness of the criminal action. *State v. Carr, supra*, 687 S.W.2d at 610; *State v. Foerstel, supra*, 674 S.W.2d at 591.

■ The defendant argues that the trial court erred in restricting the testimony of witness Raschke to the general tenets of satanism, rather than permitting him to testify to satanism's effects on the minds of its adherents. He contends and the state concedes that before witness Raschke testified, Dr. Logan already had established the first prong of the test and that the excluded Raschke testimony would have fulfilled the second prong. In support of this argument, he cites *State v. Marks, supra*, 721 S.W.2d at 55–56, where the trial court permitted a police detective to testify on the use of gypsy artifacts in confidence schemes, and *State v. Barnes*, 740 S.W.2d 340, 342–43 (Mo.App.1987), in which licensed psychologists employed by the state testified as to the Missouri Department of Mental Health's classification of mild mental retardation.

We find both cases completely distinguishable on their facts from the case at bar. In *Marks* the trial court permitted a detective with several years of experience in investigating fraud cases to testify regarding the articles and methods used by gypsies in operating scams. He did not testify to anything beyond an area in which he had unquestionable experience and expertise. *Id.* at 55–56. Likewise, in *Barnes, supra*, at 342–43, the psychologists made mere factual observations. In neither case did the witnesses make statements anywhere approaching the outer boundaries of their expertise.

■ Here, however, in an effort to prove the defense of mental disease or defect, defendant Roland sought to have an expert on satanic cults testify as to a subject outside his realm of competence, namely, the psychological impact of satanic beliefs.

To give opinion evidence on a subject, a witness must have sufficient experience and acquaintance with the subjects involved to testify as an expert. *State v. Rhone*, 555 S.W.2d 839, 841 (Mo.1977) (en banc), *citing Hyman v. Great Atlantic & Pacific Tea Co.*, 359 Mo. 1097, 1101, 225 S.W.2d 734, 736 (1949); *State v. Fisher*, 773 S.W.2d 178, 181–82 (Mo.App.1989). Witness Raschke, albeit possessed of two graduate degrees from distinguished institutions, had no degree in psychology or psychiatry. Nor did the defendant show that he had the requisite empirical knowledge of satanism's effect on the psyche of individuals to permit receipt of his testimony on that subject. *Rhone, supra*. In *Fisher*, for example, the trial court correctly prevented a clergyman from testifying to the existence of "an emotional problem" in one of his parishioners, finding that the pastor lacked the expertise necessary to make that assessment.

We have a similar situation before us. In a colloquy between the trial judge and defense counsel, Judge Barnes stated that he intended to "bend over backwards" to ensure the defendant a proper defense, but that he could not see how Mr. Raschke possessed the qualifications necessary to testify to the defendant's psychological state. We cannot find in his ruling restricting witness Raschke's testimony an untenable judicial act defying reason. Although we might have ruled differently, the trial judge employed the discretion accorded him in restricting the introduction of expert testimony and did so in a reasonable way.

Nor do we see any prejudice to the defendant flowing from Judge Barnes' ruling. Dr. Logan had already testified to both prongs of the mental disease or defect test. He opined that defendant Roland suffered from an induced psychosis, a mental disease that he deemed a "major mental illness." Further, he believed that the youth did not appreciate the quality of his killing a human being.

Moreover, witness Raschke testified that adherents of satanism adopt a code of morality glorifying all that Judeo–Christian culture condemns, such as violence. Fur-

ther, he stated that young men from broken homes rebelling against parental authority often prove the most vulnerable candidates for membership in satanic cults and that they often carry out acts of violence in efforts to gain the cults' acceptance. In addition, he discussed some of the trial exhibits generally linked to satanism, such as record covers and notebooks depicting violence and images of demonic beings. He and Mr. Stuessy stated that the lyrics of some heavy metal music contained clear exhortations to violence and rebellion and clear references to Hell and demons.

Father Lebar also testified to the violence demanded by some cults and to the obsession with satanic beliefs that overcomes some adherents of the creed. Both men testified to the secrecy and intimidation used by the cults to enforce loyalty and secrecy.

Despite this evidence, the jury chose to reject the defense of mental disease or defect. Perhaps it found the defendant's concept of satanism too murky to serve as a compelling code of ethics that subverted and reversed his sense of right and wrong. Perhaps, it doubted the satanic influences of heavy metal music, questioning whether Milton's fallen angel, "whose guile ... deceived the Mother of mankind," would rely on the likes of Mr. Ozbourne or the members of Megadeath to carry out a satanic subversion of civilization as we know it. Perhaps it doubted the influence of music on the mind, realizing that under modern history's most evil society Wagner's "Ride of the Valkyrie" preceded Der Fuehrer's speeches, the Berlin Philharmonic played Beethoven's Chorale Symphony even as the Bolshevik hordes began their seige of the city, and inmates of the death camps, spared because of their musical abilities, played Haydn and Mozart as their compatriots marched past them toward the gas chambers.

■ In his second point on appeal, Mr. Roland contends that the motion court erred in denying him relief under Rule 29.-15(g). He argues that the court failed properly to consider evidence that his trial counsel had used drugs during the time the attorney represented him, and, therefore, deprived him of his constitutionally guarantied right to effective trial counsel. He maintains that his attorney's actions at trial resulted in frequent admonishments by the trial judge that prejudiced the jury against him.

An appellate court may reverse a motion court's denial of postconviction relief under Rule 29.15 only where it finds that court's conclusions clearly erroneous. "Clearly erroneous" means that a full review of the record leaves a firm impression that the motion court made a mistake. *Amrine v. State*, 785 S.W.2d 531, 533 (Mo.) *cert. denied*, —— U.S. ——, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990); *Sidebottom v. State*, 781 S.W.2d 791, 795 (Mo.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). A movant claiming ineffective assistance of counsel first must show that trial counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances. The movant next must demonstrate prejudice resulting from trial counsel's deficient representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Amrine, supra*, at 534; *Sidebottom, supra*, at 796. A defendant bears the burden of overcoming the presumption of an attorney's competence. *Strickland, supra*, 466 U.S. at 689, 104 S.Ct. at 2065; *Amrine, supra; Sidebottom, supra.*

Here, defendant Roland produced one uncorroborated witness who testified to seeing defense counsel under the influence of drugs one evening and that sometimes thereafter he appeared to act similarly during the trial. She and two other witnesses, including the defendant, testified that the lawyer acted erratically, walked with difficulty, presented a disorganized defense, showed signs of paranoia, and appeared nervous.

No other witness testified to seeing defense counsel under the influence of drugs. Further, one witness, a former police officer who worked as a private investigator

for the lawyer, testified that he showed no signs of drug use.

The uncorroborated and imprecise testimony of a single witness does not suffice to demonstrate that defendant's attorney used drugs during his defense. Further, the lawyer's alleged erratic behavior alone does not convince us that, particularly in view of the record before us, his representation of the defendant fell below the standards mandated by law.

For the foregoing reasons, we affirm the judgments of the trial court and of the motion court.

All concur.