**STATE of Missouri, Plaintiff–Respondent,**

v.

**John M. OPRY, Defendant–Appellant.**

No. 28872.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 28, 2008.

Ellen H. Flottman, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jayne T. Woods, Jefferson City, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

John M. Opry ("Appellant") appeals from two convictions for first-degree murder; he claims trial court error in the refusal to allow a defense of not guilty by reason of a mental disease or defect and the refusal to allow a question during voir dire regarding the same issue. We find no error and affirm the conviction.

Appellant was paroled from the Department of Corrections on July 5, 2005. On July 22, 2005, Appellant entered the home of Mazie Lewis while she was on vacation; he looked around to make sure nobody was home and then made himself something to eat. He then took a gun from the home and left the home in Ms. Lewis' car and drove to his girlfriend's house where he told her the car was stolen. He returned the car that night at his girlfriend's insistence.

Two neighbors, James Grace and Nelson Cramer, were taking care of Ms. Lewis' house, and the next morning they discovered that the house had been burglarized. They reported the burglary and the authorities came to the home. Appellant returned to the home while the officers were there and watched the home from behind bushes in a nearby pasture. Appellant entered the home after everyone left and again made himself something to eat. When Appellant heard Mr. Grace and Mr. Cramer return to the home, he took the gun, moved to the basement, and stood at the bottom of the stairs. Mr. Grace and Mr. Cramer inspected the home, and when they started down the basement stairs, Appellant hid in the basement bathroom. Mr. Grace entered the bathroom where Appellant was hiding. Appellant then shot Mr. Grace, killing him. When Appellant exited the bathroom, he saw Mr. Cramer standing in the doorway to the laundry room and shot and killed him.

Appellant took Mr. Cramer's wallet and Mr. Grace's keys and left in Mr. Grace's car; he later returned to Ms. Lewis' house, set fire to it and left in Ms. Lewis' car. Appellant abandoned the car in a church parking lot and hid the gun and ammunition. He admitted his actions to the police and wrote letters of apology to the victim's families.

On October 28, 2005, Appellant was arraigned on two counts of first-degree murder and two counts of armed criminal action to which he pled not guilty. He was examined by Dr. Thomas Blansett, a psychologist, nearly two years after the arraignment. On October 23, 2007, just thirteen days before trial, Dr. Blansett informed defense counsel for the first time of his diagnosis that Appellant was not responsible for his conduct due to mental disease or defect. That same day, defense counsel faxed a motion to allow filing of notice of intent to rely on the defense of mental disease or defect and a notice of intent to rely on the defense of mental disease or defect and disclosed Dr. Blansett as a witness to the prosecutor.

At a pretrial hearing on the motion to allow filing of notice of intent, the State objected to the late notice. Defense counsel argued that it was in the court's discretion to allow the late notice of intent. The court denied the motion finding that the facts Appellant intended to rely on to prove his defense were in existence and known at the time specified by the statute; thus, the court found that Appellant had not shown good cause for a tardy effort to rely upon the defense. The court indicated, however, that it would permit Dr. Blansett to testify at trial in support of a diminished capacity defense.

In voir dire, defense counsel was permitted to ask the venire panel ten questions regarding psychological testimony, post traumatic stress disorder, and multiple identity disorder. Some of the questions asked included:

1. I expect that you're going to hear some testimony that [Appellant] is and was back in July of 2005 mentally ill and that that mental illness affected and deprived him of the ability to coolly reflect. Now, is there anybody who is unwilling to consider, and I'm not asking you to commit to a decision obviously at this point, is there anybody who is unwilling to consider psychological testimony on the issue of [Appellant's] ability to coolly reflect or deliberate?

2. Is there anybody here who perhaps has had a friend or a relative diagnosed with something called post traumatic stress syndrome or post traumatic stress disorder?

3. Is there anybody on this jury panel who cannot consider the possibility

and consider evidence that post traumatic stress disorder affects a person's mental workings and affects a person's reactions and affects a person's behavior?

4. Is there anybody here in this group who has ever had a friend or a relative diagnosed with multiple personality—or excuse me, multiple identity disorder?

5. Is there anybody on this jury panel, number one, who would just reject out of hand the idea that such a thing as multiple identity disorder exists? Anybody just thinks there's no such thing?

The court sustained an objection to the question, "Is there anybody on this jury panel who could not consider the possibility and consider evidence that multiple identity disorder affects a person's behavior?" The jury returned guilty verdicts for two counts of first-degree murder and two counts of armed robbery. This appeal follows.

▮ Appellant asserts in his first point relied on that the trial court abused its discretion in refusing to allow the late filing of his notice of intent to rely on the defense of mental disease or defect excluding responsibility. He argues that his due process rights to a fair trial and to present a defense were violated in that defense counsel showed good cause for the late notice since he disclosed the defense to the State as soon as he was aware of it and a psychologist concluded that Appellant's dissociative identity and post traumatic stress disorder prevented him from knowing or appreciating the wrongfulness of his actions. Furthermore, Appellant asserts that the exclusion of the defense resulted in fundamental unfairness because the trial court considered no other alternatives to

disallowing the psychologist's testimony, which left him with only the defense of diminished capacity.

▮ The standard when reviewing a trial court's ruling on requests to rely upon the defense of mental disease or defect is an abuse of discretion. *State v. Isa*, 850 S.W.2d 876, 886 (Mo. banc 1993). In order to rely on the defense of mental disease or defect excluding responsibility, the defendant must give notice of his intention to rely on the defense at the time his plea is entered or within ten days after a plea of not guilty. Section 552.030.2[1]; *State v. Holmes*, 439 S.W.2d 518, 520 (Mo.1969); *State v. Pisha*, 674 S.W.2d 594, 596 (Mo. App. W.D.1984). If the defendant fails to do so within the ten days, the defense can only be relied upon if permitted by the court for good cause shown. *Holmes*, 439 S.W.2d at 520; *Pisha*, 674 S.W.2d at 596. The purpose of fixing a time at which notice of intent to rely upon the defense must be given is to prevent the surprise use of such defense so that the prosecution will have the opportunity to adequately rebut the defense. *Holmes*, 439 S.W.2d at 520. Thus, the trial judge has considerable discretion in deciding whether a defendant has shown good cause such that he should be permitted to rely upon the defense despite untimely notice. *Pisha*, 674 S.W.2d at 596.

In *State v. Heistand*, this Court decided the trial court did not abuse its discretion when it found that the defendant did not show good cause for waiting over two years before raising the defense of mental disease or defect excluding responsibility. *Heistand*, 714 S.W.2d 842, 846 (Mo.App. S.D.1986). In *Heistand*, the defendant waited until his first day of trial to raise the defense. *Id.* He raised it only by introducing a statement from his attorney

---

1. All references to statutes are to RSMo 2000, unless otherwise specified.

that the defendant indicated he was hospitalized as a mental patient when he was a teenager. *Id.* The prosecutor argued that there was nothing in the record to explain why it took two years to raise the defense. *Id.*

Appellant is in a situation somewhat similar to that of the defendant in *Heistand;* he entered his initial not guilty plea on October 28, 2005, and sought to file notice of his defense nearly two years after his initial not guilty plea. As in *Heistand,* Appellant's filing of his notice was very close to the start of trial; in fact, it was only thirteen days before trial. Also, although Appellant tendered to the court a copy of Dr. Blansett's report, Appellant has provided no explanation as to why he waited until September 21, 2007, nearly two years after arraignment, to first seek an examination from Dr. Blansett.

Furthermore, Appellant has failed to show how the alleged error by the trial court prejudiced him. Appellant was permitted to present a diminished capacity defense, which the jury rejected. Where a jury refused to find that the less stringent defense of diminished capacity applied to an appellant's case, it could not possibly have found that the more stringent defense of not guilty because of mental disease or defect applied to the appellant's case. *State v. Foerstel,* 674 S.W.2d 583, 592 (Mo.App. W.D.1984); *Sempsrott v. State,* 784 S.W.2d 198, 201 (Mo.App. E.D. 1989). Thus, Appellant cannot show a reasonable probability that the jury would have reached a different result if he had been permitted to present a defense of mental disease or defect.

■■■ Moreover, Appellant would not have been able to use the defense of mental disease or defect unless he demonstrated (1) that he had a mental disease or defect; and (2) that as a result of such mental disease or defect he did not know or appreciate the nature, quality or wrongfulness of his conduct.[2] *State v. Scott,* 841 S.W.2d 787, 790 (Mo.App. E.D.1992). Appellant must establish both elements by substantial evidence. *State v. Kreyling,* 890 S.W.2d 414, 416 (Mo.App. E.D.1995). Bizarre behavior alone is not automatically enough to meet the burden imposed by statute. *Id.*

In *Kreyling,* the defendant (1) fled the crime scene, (2) admitted to the crime shortly thereafter, and (3) acknowledged that he may have seriously injured the victim. *Id.* at 416–17. The *Kreyling* court found that the defendant's actions subsequent to committing assault demonstrated consciousness of guilt and his awareness of the consequences of his criminal acts. *Id.* at 417. Here, Dr. Blansett testified that Appellant had a dissociative identity disorder and suffered from post traumatic stress disorder, both of which affected his ability to know or appreciate the wrongfulness of his alleged actions. Appellant's actions subsequent to the murders, however, demonstrate consciousness of guilt and his awareness of the consequences of his actions. After shooting Mr. Grace and Mr. Cramer, Appellant (1) took Mr. Cramer's wallet, (2) attempted to destroy the crime scene by burning it, (3) abandoned Ms. Lewis' car, (4) hid the gun and the ammunition, (5) made admissions to the police, and (6) wrote letters of apology to the victims' families. All of these subsequent acts showed that Appellant appreciated the wrongfulness of his criminal actions.

**2.** *Scott* set forth the additional requirement that a defendant must show that he "was incapable of conforming his conduct to the requirements of law." *Scott* was decided prior to the 1993 change in section 552.030, omitting that language.

While the existence of multiple personalities may have shown Appellant had a mental illness, Appellant could not rely on the defense of mental disease or defect unless that mental illness made it so that he was incapable of knowing and appreciating the nature, quality or wrongfulness of his conduct. *Compton v. State,* 172 S.W.3d 927, 929 (Mo.App. S.D.2005). The trial court considered Dr. Blansett's report and Appellant's actions after the crimes and found that the evidence did not establish that Appellant had a mental illness that prevented him from appreciating the nature, quality or wrongfulness of his criminal acts. Considering all of the above, Appellant has failed to show that the trial court abused its discretion in refusing to allow Appellant's untimely notice of the defense of mental disease or defect. Point One is denied.

 Appellant claims in his second point relied on that the trial court abused its discretion in sustaining the prosecutor's objection to Appellant's voir dire question whether there was anybody on the panel who could not consider the possibility and evidence that multiple identity disorder affects a person's behavior. Unless there is a manifest abuse of discretion and a real probability of injury to the defendant, this Court will not reverse the trial court's decision regarding voir dire. *State v. Chambers,* 234 S.W.3d 501, 510 (Mo.App. E.D.2007). The trial judge supervises voir dire and has discretion to determine the nature and extent of the questions that counsel may ask. *State v. Clark,* 981 S.W.2d 143, 146 (Mo. banc 1998). A trial court's ruling is an abuse of discretion when it "is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Johnson,* 207 S.W.3d 24, 40 (Mo. banc 2006).

Appellant's counsel had already been given the opportunity during this voir dire to ask ten questions on the subjects of psychological testimony, post traumatic stress disorder, and multiple identity disorder. In light of all of the questions Appellant's counsel was permitted to ask, it is evident that Appellant's counsel was able during voir dire to fully explore the issue of mental illness affecting a person's behavior. The exclusion of counsel's single question did not present a real probability of injuring Appellant and, thus, was not an abuse of discretion. Point Two is denied.

LYNCH, C.J., BURRELL, P.J., concur.