**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Jason Clay CARR, Defendant-Appellant.**

**No. 13594.**

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 8, 1985.

Motion for Rehearing or Transfer to Supreme Court Denied March 4, 1985.

Application to Transfer Denied
April 30, 1985.

John D. Ashcroft, Atty. Gen., Gary L. Gardner, Thomas Carter, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

C.J. Larkin, Columbia, for defendant-appellant.

PREWITT, Chief Judge.

A jury found defendant guilty of three counts of capital murder for killing his stepmother, his stepsister and his brother. For each offense, defendant was sentenced to life imprisonment without eligibility for probation or parole for fifty years. He appeals.

On March 15, 1983, defendant was 16 years of age and lived east of Hartville in Wright County with his father, his brother, his stepmother, and her daughter. Defendant was enrolled in high school and that was a regular school day, but he did not attend. He had stayed with his grandmother the night before and then returned to the house where he lived after the others had left. The record indicates that defendant had not previously been in serious trouble and that he was a good high school student, generally getting "A's and B's".

At approximately 4:15 p.m. defendant's brother, Andrew Carr, and his stepsister, Emma Downey, got off a school bus near their home. After they entered the house defendant shot Andrew in the left side of the back of his head and in front of his right ear. Gunpowder residue indicated that the shot to the right ear occurred at close range. Emma was shot in the back and in the left eye. After Patricia Carr arrived home from work at approximately 4:35 p.m., defendant shot her above the right eye and in the right temple. The wound to the temple indicated the shot was from close range.

Aaron Carr, defendant's father, came home at approximately 5:10 p.m. He saw a shovel in the front yard which had not been there when he had left that morning and the front curtains of the house were closed. Normally they were open. After Aaron Carr entered the house, defendant attempted to shoot him with a single shot .22 caliber rifle but it did not fire. As defendant tried to insert a different shell in it, his father took the rifle from him. The others had been shot with that rifle. After defendant was disarmed he cried and told his father, "I killed them all". He said he killed his brother, even though he loved him.

A psychiatrist employed by plaintiff at the State Hospital in Farmington was called as a witness by defendant. He testified that defendant did not suffer from a mental disease or defect excluding criminal responsibility. He said defendant "saw his father as an extremely evil force in his environment" and "as patronizing his stepmother, stepsister and his brother". The psychiatrist said defendant killed them "to get back at his father". The psychiatrist testified that defendant thought his father was evil because he placed restrictions on him.

Defendant's parents were divorced "about 10 or 11 years" before the trial. For some time defendant's father had a "problem with drinking" and in 1965 was sent to the penitentiary for statutory rape. Ten years before the trial he quit drinking alcoholic beverages and became a devout member of a Jehovah's Witnesses congregation. Apparently because of his religious beliefs he placed restrictions on defendant about which they conflicted. Defendant, who was six foot seven inches tall, was not allowed to play on the high school basketball team because its schedule conflicted with the family's "home bible study". He was prohibited from playing video games or from watching certain television programs.

Defendant was not allowed to date a girl who did not go to the same church. There was evidence that when his father learned of defendant's fondness for the girl he made him renounce her in church, and that

on the night prior to the shooting defendant was "rebuked and ridiculed by his father during church services because of his failure to recite a passage from the Bible". The evidence indicated that defendant was hostile toward his brother because his conduct received approval from their father.

The first contention of defendant that we discuss is that the trial court erred by refusing his instruction submitting to the jury the defense of mental disease and defect excluding criminal responsibility. He asserts there was substantial evidence to support the instruction.

 Defendant is presumed to be free of mental disease or defect excluding responsibility, and whether he had such a mental disease or defect was for the jury to decide if there was substantial evidence of lack of such responsibility. § 552.030.7, RSMo Supp.1982. An instruction submitting mental defect or disease excluding responsibility should be given only where there is substantial evidence to support it. *State v. Middlemas*, 654 S.W.2d 355, 357 (Mo.App.1983).

 The psychiatrist employed by the state was the only expert witness on this issue. He testified that defendant did not suffer from such a disease or defect. The record also indicates that defendant was examined by another psychiatrist at his mother's expense. Apparently that psychiatrist reached the same conclusion. In this point defendant relies primarily upon the testimony of his mother, Chris Dillingham. That testimony is summarized in the next four paragraphs.

After his parents were divorced, defendant initially lived with his paternal grandmother. He stayed there for approximately a year and a half and then lived with his mother and her then husband. Mrs. Dillingham had "legal custody", but because her husband verbally threatened defendant and physically abused him, he left to live with his father.

Following her second divorce, defendant lived with his mother in Cahokia, Illinois, from the fall of 1982 until the last week of January 1983. Early in January he received a phone call from his father and afterwards quit the basketball team. After the call he became moody and would eat little and would not see his friends. When he came back to live with his mother he had brought "a lot of Jehova Witness books and pamphlets". At that time he wanted to throw them away but his mother said he should not because of their cost. He stored them in a closet and after the phone call he brought them out and started reading them.

The last week of January of 1983, apparently at defendant's request, his mother took him back to Wright County to live with his father. About "a week or two" prior to the shooting Mrs. Dillingham received a phone call from defendant. She said defendant was "upset" and she knew something was wrong. "He kept saying he was trying to do the right thing but everything he did it was bad and he said his dad kept telling him he was bad because he wanted to play basketball and he wanted to drive and he wanted to date this one girl that wasn't Jehovah Witness and that he tried to be good but he was always getting into trouble for something."

Defendant told her that his problem "had to do with the church because he wanted to do these things and they kept telling him that he was bad because he wasn't going by their rules." She said he asked, "Is there only one religion and one church?" She told him that there was not. Mrs. Dillingham testified that at the time of the phone call defendant suffered from a mental disease or defect and she had no reason to believe that he changed in the seven to ten days after the phone call. She said that at the time she talked to him by phone he did not have "a mental state where he could calmly and coolly reflect on killing someone."

Defendant's father testified regarding defendant's conduct after returning to Wright County. He said that one evening after the family had gone to bed, he found a large meat fork on the kitchen counter and a baseball bat next to the door of the

parents' bedroom. Neither article had been there when the family retired. He then found an eight to twelve inch butcher knife lying on the floor underneath defendant's bed. When questioned about it, defendant stated that he "barely" remembered getting the knife.

Aaron Carr further stated that after he reprimanded defendant for watching a violent television movie defendant said "something was after him." Defendant then told his father that he was scared and had difficulty sleeping. Mr. Carr testified that he didn't think defendant had a mental problem at the time of the shooting, "I couldn't tell it at that time if he had one." While in jail defendant attempted suicide and had nightmares and inability to sleep.

Obviously, the defendant's acts were not those of a rational person. No normal person would have done the things with which defendant is charged for the reasons advanced. Those acts, more than Mrs. Dillingham's testimony, indicate that defendant had severe mental problems.

However, based upon the previous decisions of this state, we reluctantly conclude that the killings and the other evidence fall short of being substantial evidence that "as a result of mental disease or defect he did not know or appreciate the nature, quality or wrongfulness of his conduct òr was incapable of conforming his conduct to the requirements of law." See § 552.030.1, RSMo Supp. 1982.

The inquiry we are to make is whether there existed substantial evidence of defendant's mental irresponsibility at the time of the homicides. *State v. Brizendine*, 391 S.W.2d 898, 901 (Mo.1965). While great latitude is allowed in the admission of evidence, where a defense of insanity is interposed, the evidence must be relevant and material to defendant's mental condition at the time of the commission of the act charged. Id.

In *Brizendine* the report of a psychiatrist concluded that the defendant did not suffer from mental disorder which would render him incompetent and irresponsible.

The court found the psychiatrist's determination that the defendant was a "schizoid personality" together with his unusual conduct before, during and after the killing did not establish insanity which is a defense under our law and that an instruction on mental disease or defect excluding responsibility was not required. 391 S.W.2d at 902–903.

In *State v. Thomas*, 625 S.W.2d 115, 124 (Mo.1981), the court found that evidence of hostility and antagonism which the defendant felt toward the police, and specifically toward the victim, was insufficient to support a submission that defendant had a mental defect excluding responsibility. Two psychiatric evaluations indicated no mental disease or defect.

A psychiatrist testified in *State v. Foerstel*, 674 S.W.2d 583, 591 (Mo.App.1984), that at the time of the incidents defendant was charged with, the defendant had "dissociative neurosis". The opinion describes this as "a dream-like state brought on by stressful situations." At the time he was examined by the psychiatrist defendant "could not conform his conduct to the requirements of law because of the trance-like or dream-like state." When asked on cross-examination, "is it your opinion that the defendant does not suffer from a mental disease or defect," the psychiatrist answered, "yes, sir." The psychiatrist did not say that at the time of the occurrences in question the defendant suffered from mental disease or defect. The court concluded that there was not substantial evidence of a mental disease or defect under § 552.030.1 and ruled that the trial court properly refused an instruction on that defense. 674 S.W.2d at 592.

In *State v. Vansandts*, 540 S.W.2d 192, 196 (Mo.App.1976), reports of three psychiatric examinations showed that the defendant "had a history of antisocial behavior and suffered from alcoholism but did not suffer from a psychosis or a mental disease within the meaning of Chapter 552." Defendant's conduct was unusual during the acts charged and the trial, and he had been hospitalized and had attempted suicide.

The court found that this was not substantial evidence of a mental disease or defect showing lack of responsibility requiring its submission to the jury. 540 S.W.2d at 205.

Expert testimony was offered in *State v. Olinger*, 396 S.W.2d 617, 620 (Mo.1965), that the defendant's acts were "incompatable and inconsistent with normal behavior" and that he did not have "full possession of his mental faculties" at that time. The court held that an instruction on mental disease or defect was unnecessary because the psychiatrist's "testimony was so speculative, vague, and contradictory that it lacked the certainty necessary for probative value with respect to the issue on which it was offered." On the whole record the court determined there was no substantial evidence to support the instruction.

Defendant's conduct was abnormal, but there was no evidence at the time of the acts charged that his mental condition was such as to prevent him from knowing or appreciating the nature, quality or wrongfulness of his conduct or that it made him incapable of conforming his conduct to the requirements of law. Absent such a showing there was no substantial evidence to require an instruction on this issue. The point is denied.

We next discuss defendant's contention that the trial court erred in denying his motion to dismiss the charges because the juvenile proceedings against him were improperly dismissed due to his receiving ineffective assistance of counsel in the juvenile court. He asserts that his attorney was ineffective because the attorney did not present "evidence in appellant's favor and did not adequately cross-examine the witnesses presented against the appellant." At the time of that hearing defendant was represented by hired counsel, apparently secured by his mother. Thereafter and through the trial he was represented by the public defender.

Five days before trial defendant filed a motion to dismiss the information on this ground "due to the Court's lack of jurisdiction because of the improper transfer of this case from the Juvenile Division." The transcript contains the proceedings during the hearing on the juvenile officer's motion to dismiss, see § 211.071, RSMo 1978 (since amended, see § 211.071, RSMo Supp.1983), but does indicate a hearing was held on defendant's motion.

■ A contention of ineffective assistance of counsel may be raised on direct appeal. *State v. Lumsden*, 589 S.W.2d 226, 230 (Mo. banc 1979), cert. denied, 446 U.S. 984, 100 S.Ct. 2967, 60 L.Ed.2d 841 (1980). However, it must be denied if the record is not sufficiently developed to make the determination that counsel was ineffective. *State v. Mitchell*, 620 S.W.2d 347, 348 (Mo. banc 1981).

■ To establish ineffective assistance of counsel defendant must show that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Powers v. State*, 673 S.W.2d 506, 507 (Mo.App.1984). No such showing was present here.

■ The record does not reveal what, if any, witnesses could have been called or in what manner the cross-examination was ineffective. Allegations in a motion or in a brief unsupported by the record cannot be the basis of error. *State v. Hummel*, 652 S.W.2d 749, 751 (Mo.App.1983); *State v. Friend*, 607 S.W.2d 902, 904 (Mo.App.1980). This point is denied.

Defendant's remaining contention is that the trial court erred in denying his request for a change of venue. He asserts that the inhabitants of Wright County were prejudiced against him because of pretrial publicity regarding charges filed against him ten days before the trial on these charges.

A motion for change of venue was filed on November 21, 1983, seven days before the trial commenced. The motion alleged that the inhabitants of the county were prejudiced against defendant and that the plaintiff had undue influence over them. It

requested that venue be changed "to a county not extensively covered by the Springfield news media; or in the alternative, to an adjoining county within the Circuit, such as Douglas County." This request was caused, according to the motion, by news media reports of sodomy and assault filed against defendant on November 18, 1983, allegedly for activities of the defendant while he was in the Wright County jail. Counsel for defendant stated that he first became aware of the charges "while listening to the radio on Friday evening Nov. 18, 1983."

The motion alleged that a change of venue was required by Rule 32.09(c) "due to reasons of fundamental fairness". Attached to the motion were affidavits of three residents of Wright County stating that defendant could not receive a fair trial in Wright County because of the prejudice of the inhabitants against him. Also attached were newspaper articles published in the Springfield Leader and Press on November 18, 1983, and in the Springfield News and Leader on November 19, 1983. Both refer to charges of sodomy and assault filed against defendant for incidents occurring in the Wright County jail and state that he is scheduled to stand trial on three capital murder charges on November 28, 1983.

Defendant's brief contains an appendix with three exhibits, a report of the Bureau of Census, estimating the population of Wright County to be 16,400 people, an affidavit of Jane A. Meyer, Vice President and General Manager of radio station KTXR, including a coverage map which shows that the radio station is heard in Wright County, and an "ABC Audit Report: Newspaper", showing that for the 52 weeks ending December 25, 1983, the average circulation of the Saturday morning and Sunday Springfield newspapers in Wright County was 1,511.

The record does not indicate that these exhibits were presented to the trial court and plaintiff in its brief denies every "fact" defendant claims is established by reference to these exhibits. Plaintiff does admit

that Wright County has fewer than 75,000 inhabitants. Obviously, as these exhibits are not part of the record, we cannot consider them, but even had we, the result is the same.

■ As the application for change of venue was not filed within thirty days after defendant's arraignment, it was not timely under Rule 32.03(a) and defendant did not have an absolute right to a change. However, as defendant contended at trial and here, a trial judge should order a change of venue even when that rule is not followed "when fundamental fairness so requires". Rule 32.09(c).

A hearing on the motion was held on November 21, 1983. At the hearing evidence was presented regarding the newspaper articles and that KTXR, a Springfield radio station, had reported that defendant was charged with three counts of sodomy and one count of assault.

After the judge indicated he might deny the motion, counsel for defendant asked "for permission to voir dire the individual jury members, the ones that say they have individual knowledge of the case in camera." The judge said that he would allow it, "I'll rule that you can examine each and every one of them individually or however you want to in camera." Then the trial judge denied the motion and stated to defendant's counsel, "perhaps it may develop that there's enough passion and prejudice in the jury panel that you may choose to renew your motion."

■ Granting or denying a change of venue rests within the trial court's discretion. *State v. Boggs*, 634 S.W.2d 447, 457 (Mo. banc 1982); *State v. Chaney*, 663 S.W.2d 279, 286 (Mo.App.1983); *State v. Molasky*, 655 S.W.2d 663, 665 (Mo.App. 1983), cert. denied, —— U.S. ——, 104 S.Ct. 727, 79 L.Ed.2d 187 (1984). See also *State v. Harris*, 670 S.W.2d 73, 77–78 (Mo.App. 1984). To find an abuse of discretion the record must establish that the minds of the inhabitants of the county are so prejudiced against defendant that a fair trial cannot be had there. *State v. Molasky, supra,*

655 S.W.2d at 666. The trial judge is in a better position than an appellate court to assess the effect of publicity on the inhabitants of the county and to determine whether the people in the county are so prejudiced against defendant that a fair trial would be impossible. Id.

 We cannot say that there was abuse of discretion here. Also, prejudice to defendant was not established by the voir dire of the jury panel. The names of 86 potential jurors were called. The record does not disclose the number of jurors who indicated they heard about the case from the news media. When asked, eleven said they could not set what they had heard from the media aside and decide the case only on the evidence. They were excused for cause. Ten veniremen said they had talked to someone who professed to have personal knowledge of the case and six of those said this would prevent them from deciding the case solely on the evidence. Those six were also excused for cause. No one was asked specifically what they had heard or about the sodomy or assault charges.

Prior knowledge about a case does not require that a potential juror be stricken when such knowledge does not preclude their reaching a verdict based upon the evidence at trial. *State v. Hayes,* 624 S.W.2d 16, 19 (Mo.1981).

Exposure to publicity is not deemed inherently prejudicial and a juror may be sworn if he is able to set aside any opinion formed from the publicity. *State v. Molasky, supra,* 655 S.W.2d at 667. The trial court is in a better position than we are to measure and evaluate a venireman's demeanor. Id.

The court struck for cause everyone that defendant's counsel asked be stricken because of prior knowledge. The record shows that everyone who stated they could not decide the case on the evidence apart from what they may have seen or heard was excused. No jurors were individually examined, but there is no indication that defendant's counsel sought to do so nor does the record indicate that defendant's counsel was denied any request he made during the voir dire pertaining to prior knowledge. Nothing indicates that the jurors could not or did not put what they had heard aside or that defendant did not receive a fair trial.

The judgment is affirmed.

HOGAN, P.J., and MAUS and CROW, JJ., concur.