**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Douglas Wayne THOMPSON,
Defendant-Appellant.**

No. 14118.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 5, 1987.

Motion for Rehearing and to Transfer
Overruled and Denied
Jan. 27, 1987.

David Robards, Joplin, for defendant-appellant.

William L. Webster, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Judge.

At the outset it must be observed that it is within the province of this court to take notice of matters not before the trial court that cause the disposition of this appeal to be moot. *State v. Brookshire,* 377 S.W.2d 291 (Mo.1964). This court has received a copy of an opinion of the United States Court of Appeals for the Eighth Circuit in *Thompson v. Armontrout,* 808 F.2d 28 (8th Cir.1986). That opinion affirms a decision of the United States District Court for the Western District of Missouri directing the Warden of the Missouri State Penitentiary to release the defendant in this case from imprisonment under the sentence from which he appeals. However, that decision was based upon a finding the denial of the defendant's release by the Missouri Board of Probation and Parole was vindictive, contrary to the principles of *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). That decision directed the defendant's release on parole from the conviction and sentence from which he appeals in this case. It in no way obviates the duty of this court to determine the merits of that appeal. *State v. Gray,* 406 S.W.2d 580 (Mo.1966).

The defendant has been tried three times for the first degree murder of police officer Herbert L. Goss on March 10, 1961. § 559.010, RSMo 1959 (now repealed). Each time a jury found him guilty. As a result of the first trial in December, 1961, he was sentenced to death. The opinion affirming that sentence is found in *State v. Thompson,* 363 S.W.2d 711 (Mo. banc 1963). That sentence was set aside upon a Motion under Rule 27.26. *State v. Thompson,* 396 S.W.2d 697 (Mo. banc 1965).

As a result of his second trial in 1966, the defendant was sentenced to imprisonment for life. No appeal was taken from that conviction. In 1980, the defendant was placed on parole by the Board of Probation and Parole. At that time his Petition in Habeas Corpus to vacate the second sentence was pending in the United States District Court for the Eastern District of Missouri. That court denied the relief sought. However, in an opinion filed October 14, 1981, the United States Court of Appeals, Eighth Circuit, because of improp-

er impaneling of the jury, ordered the second sentence vacated. *Thompson v. White,* 661 F.2d 103 (8th Cir.1981); vacated and remanded for reconsideration in 456 U.S. 941, 102 S.Ct. 2003, 72 L.Ed.2d 463 (1982); sentence vacated on remand, 680 F.2d 1173 (8th Cir.1982); cert. denied, 459 U.S. 1177, 103 S.Ct. 830, 74 L.Ed.2d 1024 (1983).

The third trial was held in December, 1984. The jury returned a verdict of guilty of first degree murder. As a persistent offender, the defendant was sentenced to imprisonment for life. By counsel he presents five points on appeal.

A statement of the general facts concerning the homicide may be found in the published opinions cited above. However, for consideration of the defendant's points on appeal a resume of the evidence presented to the jury at the third trial is necessary. This court must "consider the evidence in the light most favorable to the verdict, giving the state the benefit of all favorable inferences that can be drawn from the evidence." *State v. Noerper,* 674 S.W.2d 100, 104 (Mo.App.1984).

As so considered, the following is such a resume. The defendant was serving a sentence of five years to life for armed robbery in San Quentin Prison, California. He was transferred to the San Luis Obispo County Jail with Sammie Tucker and Calvin Johnson. The three escaped on February 26, 1961. They then broke into a house, found a gun, waited until the owner came home, tied him up and stole his truck. They traveled to Bakersfield, where they robbed a liquor store of $70. They stole a 1961 Pontiac in Bakersfield and went to Albuquerque, New Mexico. There they robbed a liquor store of $500.

From Albuquerque, the trio traveled to Hutchinson, Kansas, where they robbed a Saveway Store of $5,200. The 1961 Pontiac was abandoned near Noel, Missouri, after the three bought an Oldsmobile in Joplin.

On March 8, in the afternoon, they arrived in Cape Girardeau. On March 8, appellant, Tucker and Johnson entered the Summers Sporting Goods store in Cape Girardeau. The owner sold Tucker a 9 mm. Luger handgun, a .22 pistol and ammunition for both. Summers sold Tucker the handguns because he had an I.D. for a John Matthews in Wichita, Kansas. Summers said since Kansas did not have a firearms permit law, such a purchase by Tucker was lawful. Summers did not sell any weapons to Johnson because he did not have identification. Defendant bought a 30/30 Winchester rifle and some ammunition. He wanted to buy a handgun, but he had a Missouri I.D. for a James Bartlett in Joplin. Summers told him he would have to get a permit for a handgun.

After leaving Summers' store, the three checked into the Townhouse Motel in Cape Girardeau. Geraldine Hartle, the housekeeper, saw the three check out of the motel on March 10, 1961; they departed in a two-tone, white and pink Oldsmobile.

At approximately 4:40 p.m. on March 10, 1961, Artie Mae Greable was working as officer manager of the Kroger Store at Town Plaza in Cape Girardeau. A man she subsequently identified as Calvin Johnson came to the check cashing window and asked her to cash a $100 bill for him. He said he wanted to make a purchase at the Rexall Drugstore next door and they could not change it for him. She gave him five $10's and ten $5's. He asked for larger bills. She said she did not have larger bills and he got angry. He then wanted to know when the Rexall closed. Ms. Greable told him 9:00, and he asked about Kroger. She said 9:00 p.m. He asked her when the Town Plaza shopping center closed. She told him everything closed at 9:00.

In a statement read to the jury, defendant said the three planned to rob the Kroger store on March 10. They intended to catch the employees as they came out at 9:00 and make them open the safe.

As Don Riehn, the manager of the Kroger store, was closing the store at 9:00 p.m. on that day, he saw someone standing just outside the door. Riehn opened the door slightly and said, "The shopping center is

closed and we do not like people lingering after closing." The man quickly departed. About this time, Riehn saw the manager of another store, Ivan Irvin, leaving the parking lot and he motioned to him. Riehn went outside and told Irvin he thought "that man was up to no good and he was going to try to rob me." He pointed to the man. The man was looking at Riehn and Irvin and walking backwards. Irvin told Riehn there was another man right behind him and Riehn said in a loud voice, "I'm going to call the police." Riehn then went back into the store and called the police.

Irvin said the first man, who was walking backwards, was heading toward a two-tone, white and persimmon color Oldsmobile. He identified the second man, the one he warned Riehn was behind him, as Calvin Johnson. When Riehn went into the store, Johnson walked past the stores and headed for a bridge. Irvin put his lights on high beam and Johnson turned and reached for something in his trench coat. Johnson then turned, crossed the bridge, crossed Highway 61 and entered a vacant field.

Tucker was in the car at the Kroger lot. Tucker picked the defendant up as police arrived. They could not find Johnson and they left. Johnson's involvement ended here.

Officer Shannon Kelley was driving a patrol car and was accompanied by reserve officer Robert Ross. Officer Donald Crittendon was driving a second patrol car and was accompanied by reserve officers Herbert L. Goss and Hugo Lang. They were at Houck Stadium when they received a call to go to the Kroger store. When the two cars got to the parking lot, Kelley saw a two-tone white and persimmon Oldsmobile go west on William Street. The Crittendon patrol car followed the Oldsmobile north on Highway 61. The Kelley patrol car followed. Officer Crittendon radioed that he intended to stop the car just north of Wimpy's Drive-In on Highway 61. As Officer Kelley approached Wimpy's, he saw that the Oldsmobile had stopped and Crittendon's car was stopped behind it. He drove past the Oldsmobile, turned around, came back and parked across from the other two cars, headed south.

Kelley observed that Crittendon had approached the driver's side of the Oldsmobile and was talking to the driver. Lang was behind the car, on the driver's side, and he had a flashlight which he was shining through the back glass of the Oldsmobile. Goss was on the passenger's side of the car, facing west. Crittendon asked the driver for identification. After that, Crittendon asked for the driver to step out of the car. Crittendon backed up, the door opened, the driver got out and shot Crittendon point blank in the stomach. The defendant had been slumped down in the passenger's seat and more or less slid out of the car. Almost simultaneously with the first shot, two shots rang out from the passenger's side of the the vehicle and Officer Goss called out, "I am hit. I'm hit." Two flashes were seen on the passenger's side of the Oldsmobile. The driver, who was identified as Tucker, started shooting at Kelley across the road. Kelley shot six times and hit Tucker. Tucker then put the car in gear and began to take off as the passenger, defendant, ran to get back in the car.

Goss had been hit by a shot that penetrated both legs in the knee area. The shot severed the arteries in both legs. Goss died from loss of blood from those wounds. Crittendon died from his wound. A statement of the defendant reciting many of the facts herein set forth was read to the jury. In that statement the defendant maintained he did not fire his gun during this series of events.

Lang confirmed the events leading up to the shooting. He testified that when the first shots were fired, he was someplace between the Oldsmobile and the patrol car. After the firing started he went to the rear of the Oldsmobile and, while between the vehicles, fired at the passenger later identified as the defendant. He said at that time Goss was not in his vision. He then ran to the rear of the patrol car and then across the road into a ravine or ditch. He later saw Goss lying on the shoulder. He placed

Goss further east than other witnesses. At no time did Lang see the defendant fire or have a gun.

A car hop at Wimpy's, the adjacent drive-in, saw an officer walk from the passenger's side of the patrol car to the passenger's side of the Oldsmobile. The officer was standing at an angle, looking in the back of the Oldsmobile. The passenger's door on the Oldsmobile opened and the witness saw two flashes come from the passenger's side. The officer fell back away from the Oldsmobile. The car hop had seen no one standing but the police officer. There was no evidence that a police officer fired until after Goss cried that he was hit.

Defendant and Tucker drove to Jackson where they saw three boys drinking beer in an automobile. They stole the boys' 1961 Chevrolet hardtop at gunpoint. The defendant drove the Chevrolet.

Elmer Chatman, Wayne County Sheriff, was riding with Edwin Wright, a highway patrolman, on the evening of March 10, 1961. They were parked at the junction of Missouri Highways 34 and 51 in Marble Hill. They saw a 1961 Chevrolet that matched the description of an automobile being used as a getaway for two individuals involved in the shooting of two Cape Girardeau police officers. Wright got out of his vehicle with his shotgun to stop the automobile, but it went by him. He got in his vehicle, turned on his lights and siren and caught up to the Chevrolet. Tucker started shooting at him. During the chase, the defendant drove in excess of 100 miles per hour. Sheriff Chatman returned Tucker's fire. Wright got very close to appellant and Tucker fired a shot straight through the windshield. Shortly after that, Wright felt the left front tire of his vehicle going down and suspected he had a puncture. He drove until he could no longer handle the car. Sheriff Chatman said his side was beginning to hurt. Wright turned on the dome light and saw a hole in Chatman's shirt above his belt on the left side.

Defendant drove on to the farm of Mr. George Gray. Gray was in bed when he heard a car drive up. Gray went to the front door and defendant was there with a pistol pointed at Gray's face. He told Gray to give him the keys to the car. Gray told him the car was not his and he did not have the keys. Gray told defendant to take a truck, the keys were in it. Defendant then struck Gray in the head with his pistol. Defendant and Tucker both then entered the house. Gray's son came down the stairs, gave the men the keys to his car and they left.

Defendant and Tucker reached a dead end. They decided they could not get away by car so abandoned the Gray vehicle and walked up a hill. At the top of the hill, defendant covered Tucker with leaves and left him. He was found by use of bloodhounds the next day. He surrendered. Defendant eluded the dogs. The evidence shows that in his evasive action he hid in an abandoned house about four days.

On March 17, 1961, defendant returned to U.S. Highway 67. There he thumbed a ride with a man driving a 1950 black Mercury. He paid the man $5 to go to Poplar Bluff. On the way, the man picked up another man and a woman. That day Highway Patrolman Glen Davis was parked on U.S. Highway 67 north just south of U.S. 60 west intersection, north of Poplar Bluff. He observed a black Mercury drive by with four people in it. He pursued it because he was suspicious. The vehicle made an improper pass and he stopped it.

The driver got out of the car and asked what he had done wrong. While Davis was talking to the driver, he saw the defendant in the car. He asked him his name. The defendant said "Taylor from Ellsinore." Davis walked over to the passenger's side and asked "Mr. Taylor" to get out. He said, "Get your hands on the car, Mr. Taylor", pushed him with one hand and tried to draw his pistol. Defendant turned and pointed an automatic pistol at Davis. Defendant said, "Don't do it ... I will kill you." He told Davis to get in the car, and Davis refused. Defendant then said, "Get in this car. I mean it. I will kill you."

Davis then went to the ground and made a dive towards the rear of the car.

Defendant fired at Davis. The bullet hit the back of the car and ricocheted into Davis' right shoulder. Defendant and Davis exchanged gunfire through the windows of the car. Davis fired three shots and defendant eight or nine. Davis's third shot hit defendant and he disappeared momentarily. Davis saw defendant again and he had blood on his face, but he kept firing. The driver, Mr. Raymond Glover, was standing near the car. Defendant jumped from the side of the car and fired at Glover and Davis. He hit Glover. Defendant then ran for Davis' patrol car and took off. In relating the events, Davis revealed Glover died. Upon defendant's specific objection, the jury was instructed to disregard that revelation.

Defendant drove around looking for a garage in which to hide the patrol car. He saw such a garage, pulled into it and shut the door. He then went inside the house and told the people that the police were after him and he wanted no trouble. Soon thereafter officers arrived. The defendant gave himself up.

The defendant's first point is:

The trial court erred in failing to strike the jury panel and grant a change of venue when it became clear that so many on the panel had knowledge of the case and/or formed an opinion as to the guilt of the defendant, particularly:

(a) Many, a majority, of the persons who actually served on the jury had either heard the defendant was guilty or had formed an opinion that he was guilty:

(b) Several such persons knew that the defendant had previously been convicted (at least once) of the crime charged:

(c) Several such persons knew that the defendant had done 'time' for the crime charged: and

(d) At least one of those such persons knew that a co-defendant had got [sic] the electric chair for the crime charged,

so that it was impossible to sit a full panel of qualified jurors before the peremptory challenges were made.

Upon general inquiry on voir dire, each member of the panel indicated they had heard of the case. The trial court determined that examination of the panel concerning knowledge of the case would be on an individual basis. After such individual examinations had proceeded for a time, the defendant made a motion for a change of venue or to strike the panel.

To support his first point, in argument in his brief, the defendant states his version of the results of the examination of the twelve jurors and an alternate. For example, he says, Juror Spies had "always heard everyplace" the defendant was guilty. Further, he recites that Juror Cooney knew the defendant had been convicted at least once. She had also heard people talk about the case. She didn't know if that would cause her to have an opinion on guilt. For a final example of such statements he says Juror Gunther's mother-in-law had talked to her about the case and she understood the defendant had gone to jail and done some time.

The statement of this point and argument under it demonstrate why the point has no merit. That statement and argument overstate the facts in favor of the point and omit the portions of the voir dire favorable to the actions of the trial court. In its excellent brief, the state meticulously points out those overstated facts and omissions. For example, the examination of Juror Spies includes the following:

Mr. Ankney [Assistant Attorney General]: The Judge asked everybody here if they had heard about the Douglas Wayne Thompson case and everybody said they had. You had heard about it?

Venireman Spies: I have.

Mr. Ankney: How had you heard about it?

Venireman Spies: Just the fact, or *vaguely* over the time it happened.

Mr. Ankney: You said 'vaguely'?

Venireman Spies: Yes.

Mr. Ankney: Is there anything that would have caused you to have some type of opinion when you come in here that he's guilty or not guilty or that you should wait and see the evidence?

Venireman Spies: *No, I haven't judged him.*

Mr. Ankney: You may have seen papers and things, and there you may have believed some of the things they said.

Venireman Spies: *I read very few papers on it,* but I did remember seeing it on TV one time.

Mr. Ankney: Whatever you did read may or may not be true; is that correct? Do you believe that?

Venireman Spies: Yes, sir.

Mr. Ankney: But what you see in the courtroom and on the witness stand, is that the only thing that you will consider in reaching your verdict?

Venireman Spies: Yes, sir.

Mr. Ankney: I have nothing further.

Mr. Curran [Defense counsel]: Have you discussed the case with anybody, friends or family, talking about what they know about the case?

Venireman Spies: No. *I have kind of ignored it.*

Mr. Curran: Is that for a reason?

Venireman Spies: No. *I just don't believe in condemning anybody until—*

Mr. Curran: Has anybody ever told you they thought he was guilty?

Venireman Spies: You always hear that everyplace.

Mr. Curran: Did you have any feelings one way or the other when you came in this morning?

Venireman Spies: Not really.

Mr. Curran: What's the last thing you read on it or saw on it? When was that?

Venireman Spies: *I didn't even read the paper.* Someone said it was in a paper this week or something, but I didn't read that.

Mr. Curran: Did you know what cause you were going to be on before you came down here?

Venireman Spies: Yes, I did.

Mr. Curran: Nothing further. (Emphasis added).

For a further example, the examination of Juror Cooney included the following:

Mr. Ankney: Ms. Cooney, you know something about this case or you have heard something about the case?

Venireman Cooney: Only that in 1961 he went to trial. Didn't he? *I don't really know very much about it.*

Mr. Ankney: Do you know anything more about it than that?

Venireman Cooney: Wasn't he convicted once?

Mr. Ankney: Those are the things you think you have heard?

Venireman Cooney: That's it.

Mr. Ankney: I'm not here to give you more information. Is that from reading the newspapers or talking to people?

Venireman Cooney: Talking to people.

Mr. Ankney: Is there anything about that that would cause you to have an opinion when you come in here as to whether he's guilty or not?

Venireman Cooney: I don't know.

Mr. Ankney: The law says you have to, if you are a juror, decide this case from only what you see in the courtroom.

Venireman Cooney: And the evidence.

Mr. Ankney: But—we can't erase your memory, but what you heard before you came into the courtroom is not to be of any value when you are deciding this case. Do you understand that?

Venireman Cooney: Yes, sir.

Mr. Ankney: Can you do that?

Venireman Cooney: I guess so.

Mr. Ankney: Has anybody expressed an opinion to you about this case?

Venireman Cooney: Opinion?

Mr. Ankney: Has anybody told you—

Venireman Cooney: My husband didn't know anything about it either.

Mr. Ankney: So you really don't know much about it and you can decide it from the evidence in the courtroom, I take it; is that right?

Venireman Cooney: *Yes.*

Mr. Ankney: I have nothing further.

The Court: Kevin?

Mr. Curran: Have you read any recent articles or seen anything on television recently regarding this case?

Venireman Cooney: No.

Mr. Curran: Is that your most recent memory, back in 1961, that something happened?

Venireman Cooney: No. Recently, as I said—well, we were going to be called up for this trial, and I said 'Who's he,' you know. That's the only thing. They said he supposedly did something in 1961. That's all I know. I didn't want to be completely ignorant.

Mr. Curran: You don't have to qualify. We just want to know what you have to say. (Emphasis added).

As a final example, the examination of Juror Gunther included the following:

Mr. Ankney: Mrs. Gunther, you indicated you knew something about this case.

Venireman Gunther: Just what I heard this morning downstairs.

Mr. Ankney: Is that all?

Venireman Gunther: My mother-in-law had mentioned that it was a murder trial.

Mr. Ankney: You don't know any details about it?

Venireman Gunther: No.

Mr. Ankney: You don't know what happened since the incident occurred?

Venireman Gunther: I understand that Mr. Thompson had gone to jail and done some time.

Mr. Ankney: Would that in itself either prejudice you or would you have that in your mind so that you cannot decide the case on the facts that you would hear?

Venireman Gunther: *I don't think that would make a difference.*

Mr. Ankney: The Judge has already indicated Mr. Thompson is innocent until proven guilty. Do you understand that? *Or unless he's proven guilty.*

Venireman Ankney: *Yes, sir.*

Mr. Ankney: *Would you presume him innocent until or unless the State proves him guilty?*

Venireman Gunther: *I believe so.*

Mr. Ankney: *And decide this case only on the evidence you hear in the courtroom?*

Venireman Gunther: *I believe so.*

Mr. Curran: Have you read anything in the newspapers yourself?

· Venireman Gunther: Not a bit.

Mr. Curran: Or seen anything on television about it?

Venireman Gunther: No.

Mr. Curran: Just from what other people have told you?

Venireman Gunther: Right.

Mr. Curran: Have the other people expressed an opinion about the case?

Venireman Gunther: No. *Nobody seems to know anything personally,* just a big trial is coming up, and that's about all I really heard.

Mr. Curran: I think you know we are interested in whether people have said something to you about what is alleged or the facts or their opinion as to whether he's innocent or guilty. Has anyone done anything like that?

Venireman Gunther: *No, they haven't.*

Mr. Curran: I have nothing else. (Emphasis added).

The general rules applicable to this bifurcated point are well established. "When the statutory procedures are followed, as occurred here, the decision to grant or deny a change of venue rests within the trial court's discretion, and that ruling is not to be disturbed unless an abuse of discretion is demonstrated." *State v. Boggs,* 634 S.W.2d 447, 457 (Mo. banc 1982). "In order to find an abuse of discretion, it is necessary to conclude that the record permits no interpretation other than that 'the minds of the inhabitants of the county ... are so prejudiced against the defendant that a fair trial cannot be had therein.' § 545.430; see also Rule 32.04(a)." *State v. Molasky,* 655 S.W.2d 663, 666 (Mo.App.1983), cert. denied, 464 U.S. 1049, 104 S.Ct. 727, 79

L.Ed.2d 187 (1984). Also see *State v. Carr*, 687 S.W.2d 606 (Mo.App.1985).

Even if a prospective juror has formed an opinion on an issue, if that 'opinion is founded only on rumor or newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn.' § 546.150. Exposure to publicity is not deemed inherently prejudicial and a juror may be sworn if he is able to set aside any opinion formed from the publicity when he enters the jury box. *State v. Molasky*, supra, at 667.

A similar bifurcated point was considered in *Molasky*. In that case 40 items of publicity had appeared in the St. Louis Post Dispatch. Forty-four articles had appeared in the St. Louis Globe Democrat. The appellate court noted the denial of a change of venue by the trial court was supported by the examination of the panel that demonstrated only three members had formed an opinion. They were promptly excused for cause. The individual examination of the panelists in this case developed a very similar factual situation. The determination of the trial court that a fair trial in Scott County would not be impossible was not an abuse of its discretion. *State v. Boggs*, supra. Cf. *State v. Carr*, supra.

On the branch of the point that the trial court erred in not striking the jury panel, it is important to note the trial court ordered individual examination of the panelists. Cf. *State v. Bullington*, 684 S.W.2d 52 (Mo.App.1984).

■ Contrary to the defendant's contention, the fact the panel had knowledge of the case or the defendant's prior conviction did not per se disqualify the panel or any member thereof. This conclusion is supported by practicality and logic and a multitude of authorities.

In judging the qualifications of an individual juror the trial court makes its determination based upon the whole examination of the juror. *State v. Garrett*, 627 S.W.2d 635, 642 (Mo. banc 1982), cert. denied, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). To show an abuse of discretion, the bare possibility of prej-

udice is not enough; instead, it must clearly appear from the evidence that the challenged venire person was in fact prejudiced. *State v. Cheesebrew*, 575 S.W.2d 218, 221 (Mo.App.1978).

*State v. Evans*, 701 S.W.2d 569, 572 (Mo. App.1985).

Prior knowledge about a case does not require that a potential juror be stricken when such knowledge does not preclude their reaching a verdict based upon the evidence at trial. *State v. Hayes*, 624 S.W.2d 16, 19 (Mo.1981).

Exposure to publicity is not deemed inherently prejudicial and a juror may be sworn if he is able to set aside any opinion formed from the publicity.

*State v. Carr*, supra, at 613.

This voir dire reveals knowledge, but the mere fact that a juror has knowledge of a prior verdict or other fact relating to the defendant does not disqualify her as a matter of law. E.g., *State v. Dragon*, 135 Vt. 168, 170, 376 A.2d 12, 13–14 (1977); *State v. Rickert*, 124 Vt. 380, 383, 205 A.2d 547, 550 (1964); *Murphy v. Florida*, supra, 421 U.S. [794] at 800, 95 S.Ct. [2031] at 2036 [44 L.Ed.2d 589]; *Commonwealth v. Richard*, supra, 384 N.E.2d [636] at 638; Annot., supra, 6 A.L.R.3d at 526.

*State v. Hohman*, 138 Vt. 502, 420 A.2d 852, 858 (1980). To the same effect are *Tucker v. State*, 429 So.2d 1165 (Ala.Cr. App.1983); *State v. Poland*, 144 Ariz. 388, 698 P.2d 183 (banc 1985); *Taylor v. State*, 155 Ga. 785, 118 S.E. 675 (1923); *State v. Sanders*, 223 Kan. 273, 574 P.2d 559 (1977); *Sommerville v. State*, 521 S.W.2d 792 (Tenn.1975); *State v. Hohman*, supra.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Dobbert v. Florida*, 432 U.S. 282, 302, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344, 362 (1977). In this case, panelists who indicated their knowledge of the case would preclude them from reaching a verdict based upon the evidence at trial were promptly excused for cause. The quoted portions of the examinations of Jurors Spies, Cooney and Gunther are illustrative of the examination of the panelists who remained on the panel. The trial court's determination that a panelist is qualified will be rejected only upon a clear showing of abuse of discretion by the trial court. *State v. Draper*, 675 S.W.2d 863 (Mo. banc 1984); *State v. Evans*, supra. The record reveals the trial court did not abuse its discretion in this respect. It did not err in failing to strike the panel. *State v. Molasky*, supra; *State v. Trimble*, 654 S.W.2d 245 (Mo.App.1983). The defendant's first point is without merit.

The defendant's second point is:

The trial court erred in admitting into evidence testimony showing that the defendant had committed a robbery in California and been put in jail and, thereafter, went on a spree involving several crimes between California and Missouri, before the shooting in question occurred, and testimony showing that after the shooting occurred the defendant committed several other crimes, including a homicide, before his arrest, as this evidence deprived the defendant of his right to be tried solely on the charge contained in the information, in that such evidence concerned separate and distinct crimes for which the defendant was not on trial and no logical connection between the shooting in question and such other separate and distinct crimes was ever shown and, further, because even if such a connection was shown and existed the prejudice created by such evidence greatly outweighed whatever probative value it might have had.

The applicable general rule is stated as follows:

It is also established that although proof of commission of separate crimes is generally not admissible, such proof is admissible if it 'has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial ....' 'Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial.'

*State v. Wing*, 455 S.W.2d 457, 464 (Mo. 1970), cert. denied, 400 U.S. 1009, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971).

In recognition of that general rule, the defendant acknowledges that evidence of the California escape, of the plan to rob Kroger's store, of the flight from the homicide scene and firing at pursuing officers was relevant. He complains that evidence of the crime for which he was imprisoned in California and the length of sentence was not relevant. He makes the same contention concerning evidence of the crimes committed between the California escape and the tragedy in Cape Girardeau. He also argues there was no relevance in the evidence of his subsequent activities in the theft of two automobiles at gunpoint, the wounding of a sheriff and a highway patrolman and the homicide of another person.

Within the general rule, it is established that evidence of escape is relevant to establish motive to commit further crimes. *State v. Barnett*, 611 S.W.2d 339 (Mo.App.1980). Evidence of the defendant's escape is relevant to "establish defendant's identity, motive, intent, and show a common scheme or plan, all of which are recognized exceptions to the general rule prohibiting evidence of other unrelated crimes." *State v. Lee*, 576 S.W.2d 341, 342 (Mo.App.1978). It has also been held that evidence of flight was admissible to show guilt. *State v. Triplett*, 620 S.W.2d 398 (Mo.App.1981). The same is true of the actions of a defendant in resisting arrest.

*State v. Scott,* 687 S.W.2d 592 (Mo.App. 1985).

 Under these principles, the nature of the California conviction and the length of the defendant's sentence was relevant to establish the intensity of the defendant's motive to avoid recapture. The robberies by the trio before reaching Cape Girardeau demonstrate a plan to live by armed violence. Cf. *State v. Engleman,* 653 S.W.2d 198 (Mo.1983). The actions of the defendant after Officer Goss was killed are similar to the actions of a defendant in *State v. Pharr,* 115 Wis.2d 334, 340 N.W.2d 498 (1983). In that case the court held admissible evidence of a subsequent shooting and said "the act of shooting at Trooper Luther in Dane county explains the Rock county shooting incident 'as caused by a general plan [to rob the Turners and *escape at all costs*] of which they are the individual manifestations.'" Id., 340 N.W.2d at 503 (emphasis added). That logic establishes the relevance of the defendant's actions subsequent to the shooting of Officer Goss.

In *State v. Tharp,* 27 Wash.App. 198, 616 P.2d 693 (1980), the defendant was on trial for murder. In addition to evidence of the murder, the court admitted evidence that the defendant was furloughed from a reformatory and that over two days the defendant had illegally entered and taken objects from an automobile, burglarized a residence and stolen a truck and an automobile. In holding that evidence was properly admitted, the court said,

The evidence substantially connected Tharp to all three crimes, as well as the murder of William Bond. The jury was entitled to know the whole story. The defendant may not insulate himself by committing a string of connected offenses and thereafter force the prosecution to present a truncated or fragmentary version of the transaction by arguing that evidence of other crimes is inadmissible because it only tends to show the defendant's bad character. '[A] party cannot, by multiplying his crimes, diminish the volume of competent testimony against him.'

*State v. Tharp,* supra, 616 P.2d at 697–698.

In *United States v. Cochran,* 475 F.2d 1080 (8th Cir.1973), a defendant was charged with robbery and three counts of abduction which occurred over a period of several days. On appeal the defendant contended

the admission of evidence of criminal conduct not charged in the indictment— shooting at police officers, holding a gun to LePlante's head and threatening him, abducting a lady in Boonville, and stating to Lucas that he shot a police officer—inflamed the jurors, created undue prejudice, disparaged the defendant's character, and denied him a fair opportunity to defend against the indicted charges.

Id. at 1082. The court denied that conclusion saying,

The questioned evidence in this case concerns 'an uninterrupted course of action' that is relevant to aid in proving motive, intent, absence of mistake, and a common plan or scheme to commit the alleged abduction crimes in avoiding apprehension on the bank robbery offense. The objected to evidence was a part and parcel of the criminal spree of bank robbery and the consequent acts of abduction, threats, and intimidation to avoid apprehension.

Id. at 1082–1083 (footnote omitted). For the same reason the evidence of the defendant's serial commission of criminal acts was relevant. Also see Wharton's Criminal Evidence § 180 (14th ed. 1985); *State v. Kenley,* 693 S.W.2d 79 (Mo. banc 1985), cert. denied, —— U.S. ——, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986).

The defendant complains the evidence was so prejudicial it outweighed its probative value.

Any incriminating evidence is by definition prejudicial. Relevance is the touchstone of due process, and beyond that the decision whether potentially prejudicial or inflammatory evidence should be admitted lies within the sound discretion of the trial court, [*State v. Woods,* 596

S.W.2d 394 (Mo. banc 1980)], which is in a better position to balance the probative value and danger of the evidence.

*State v. Shaw,* 636 S.W.2d 667, 672 (Mo. banc 1982). The trial court did not abuse its discretion in this case. The defendant's second point is denied.

■ The defendant's third point is that the verdict directing instruction was erroneous for the reason that

such instruction did not require the jury to find that the defendant had the requisite mental state at the time of the shooting in question and hypothesized the defendant was guilty as either an aider and abettor or as a principal, whereas, the evidence, supporting the state's theory of the case, was insufficient to submit on an aider and abettor theory and, as a result, the defendant was prejudiced because the jury was not required to find that he deliberately and intentionally caused the death of Goss.

The verdict directing instruction was as follows:

## INSTRUCTION NO. 9

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on March 10, 1961, in the County of Cape Girardeau, State of Missouri, the defendant or another caused the death of Herbert L. Goss by shooting him, and

Second, that the defendant or another intended to take the life of Herbert L. Goss, and

Third, that the defendant or another considered taking the life of Herbert L. Goss and reflected upon this matter coolly and fully before shooting him, and

Fourth, that the defendant acted either alone or knowingly and with common purpose together with another person in the conduct referred to in the above paragraphs,

then you will find the defendant guilty under Count I of murder in the first degree.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the foregoing, you must find the defendant not guilty under Count I of that offense.

The verdict directing instruction was preceded by the following instruction:

## INSTRUCTION NO. 8

All persons are guilty who knowingly act together with the common purpose of committing an offense, or who knowingly and intentionally aid or encourage another in attempting to commit it, and whatever one does in furtherance of an attempt to commit the offense is the act of each of them.

The presence of a person at or near the scene of an offense at the time it was attempted is alone not sufficient to make him responsible therefor, although his presence may be considered together with all of the evidence in determining his guilt or innocence.

The defendant assaults the verdict directing instruction by several arguments. However, the only allegation of error in his motion for a new trial was that the instruction allowed the jury to find guilt without finding the defendant acted with deliberation. This was based upon the use of "the defendant or another" in paragraph Third.

Rule 29.11(d) in part provides: "In jury tried cases, allegations of error to be preserved for appellate review must be included in a motion for new trial...." Any other allegation of infirmity in the instruction may be considered only as plain error. *State v. Fletcher,* 709 S.W.2d 924 (Mo.App. 1986).

Standing alone the phrase "defendant or another" acted with deliberation would not adequately require a finding the defendant had the requisite mental state. However, by paragraph Fourth the jury was required to find the defendant acted alone, which would include acting with deliberation as

submitted in paragraph Third. Or the jury was required to find the defendant acted knowingly and with common purpose with another person in the conduct submitted in the preceding paragraphs, including Paragraph Third. This clearly requires a finding the defendant acted knowingly and with the common purpose to deliberately take the life of Goss. This requirement is reinforced by Instruction No. 8.

The submission is most like the submission found sufficient in *State v. White*, 622 S.W.2d 939 (Mo. banc 1981), cert. denied, 456 U.S. 963, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). There is little doubt the verdict directing instruction could have used better language in submitting the element of deliberation by the defendant. However, by a common sense interpretation of all of the instructions, the jury was required to find the defendant acted with deliberation.

In his brief the defendant presents other arguments why the verdict directing instruction was erroneous. As noted, even if those arguments demonstrate an error, the same may be considered only as plain error. He first argues that the instruction is not patterned upon MAI–CR 2d 2.12 effective January 1, 1983. He says this is required by Notes on Use 1 to that instruction. He then states that the state's evidence shows all of the elements of the offense to have been committed by the defendant, although aided by Tucker. He then argues Notes on Use 6(d) to the above MAI–CR 2d 2.12 states that a submission by such an instruction is not necessary, but if used it should be modified as specified in that instruction. Failure to do so he contends is error. Finally, he argues that error is established because the instruction did not submit the element of deliberation as directed by Notes on Use 7 to MAI–CR 2d 2.12, effective January 1, 1983.

All of these arguments are based upon the premise the use of MAI–CR 2d 2.12, effective January 1, 1983, was mandatory. The defendant's premise overlooks other pertinent provisions of MAI–CR 2d.

The following is contained in How to Use this Book, a part of MAI–CR 2d. "Thirteenth. Is a homicide case being tried? If so, the forms and Notes on Use in the 15.00 series will override any conflicting directions on Notes on Use elsewhere in MAI–CR. See, again, MAI–CR 2.70–2.73."

Supplemental Notes on Use applicable to the 15.00 series of MAI–CR 2d includes the following: "2.a. For homicides committed before September 28, 1975, the substantive law will be that found in the bound Revised Statutes of 1969, i.e., the 'old' law. *The state's verdict directing instruction for those homicides will be in accordance with the MAI–CR homicide forms effective March 1, 1975.*" (Emphasis added). An identical direction is found in the Supplemental Notes on Use Applicable to the 13.00 Series of MAI–CR 2d.

Verdict directing Instruction No. 9 and corollary Instruction No. 8 are patterned upon MAI–CR 2.10 and 2.12, effective March 1, 1975. As directed, Instruction No. 9 ascribes certain conduct to "the defendant or another" submitting all elements of the offense patterned upon MAI–CR 6.02 Murder: First Degree, effective March 1, 1975.

The use of that MAI–CR 2.12 instruction was not contrary to the Notes on Use applicable thereto. The use of MAI–CR 2.10 to 2.14 are tied together. The Notes on Use to MAI–CR 2.10 in part provide: "1. This instruction should be used where there is evidence . . . (c) that defendant was a member of a conspiracy to commit an offense, where the offense submitted is other than the separate and independent crime of conspiracy, . . . ." MAI–CR 2.10 Notes on Use 1. Further, Notes on Use 5 to that instruction provides: "5. MAI–CR 2.10 together with either MAI–CR 2.12 or 2.14 should be used where it is not clear from the evidence whether defendant acted alone or with another or others. The unnecessary use of these instructions will not be deemed prejudicial error in absence of a showing of prejudice under the particular circumstances of the case." MAI–CR 2.10 Notes on Use 5.

The elements submitted by Instruction No. 9 include more than who fired the gun.

For example, there could be a question of whether Tucker deliberately decided to take the life of Goss and the defendant acted with common purpose or the defendant made that deliberate decision. Further, the circumstances were such that the jury could have found Tucker and the defendant, with deliberation, agreed to virtually simultaneously open the doors and kill the officers; a conspiracy to kill Goss within the meaning of said Notes on Use 1. Still further, said Notes on Use 5 says the unnecessary use of MAI–CR 2.12 is not prejudicial error in the absence of a showing of prejudice.

■ The defendant argues he was prejudiced because the use of the word "another" in paragraph First nullified his defense that Goss was shot by another police officer. For the defendant's guilt under such circumstances see *State v. Baker*, 607 S.W.2d 153 (Mo. banc 1980); *State v. Moore*, 580 S.W.2d 747 (Mo. banc 1979). His argument is not sound. Each of paragraphs First, Second and Third refer to the defendant or another. Certainly, the obvious reference by "another" in each paragraph is to Tucker. There was virtually no evidence Tucker shot Goss. But, had the jury so believed in view of paragraph Fourth, a verdict of guilty would have been authorized. The terminology of Instruction No. 9 could have been better. However, the defendant has not demonstrated prejudice because of that terminology. Notes on Use 5, supra. Certainly, he has not established the instruction misdirected the jury or failed to instruct the jury so as to cause manifest injustice or miscarriage of justice. Rule 29.12(b); *State v. Pearson*, 647 S.W.2d 898 (Mo.App.1983).

■ The defendant's fourth point is that the trial court erroneously gave an instruction patterned upon MAI–CR 2d 3.60. That instruction reads as follows:

INSTRUCTION NO. 14

If you find and believe from the evidence that the defendant was involved in offenses other than the one for which he is now on trial; an escape from the St. Luis Obispo County Jail on or about February 26, 1961; or burglarized a home near Bakersfield, California on or about February 26, 1961, or stole a firearm, or feloniously restrained the owner or robbed him of a pickup truck; or robbed a liquor store in Bakersfield, California, or stole a 1961 Pontiac automobile in Bakersfield, California; or robbed a liquor store in Albuquerque, New Mexico; or robbed a Saveway Super Market in Hutchinson, ·Kansas, you may consider that evidence on the issue of identification, motive, intent, absence of mistake or accident, and presence of a common scheme or plan. You may not consider such evidence for any other purpose.

The defendant first complains that instruction includes the fact such evidence may be used for identification and there was no issue of identification. That argument itself establishes that reference could not have been prejudicial.

He next argues the instruction highlights a list of some crimes committed by the defendant which were erroneously admitted. It has been established evidence of those crimes were not erroneously admitted. In addition, this instruction correctly tells the jury the limitation upon its consideration of that evidence. That was not prejudicial. The point has no merit.

■ The defendant's fifth point is:

The trial court erred in causing the defendant to be reincarcerated after the jury returned its verdict of guilty because at that time he had been granted and was serving a parole in connection with the Goss killing so that his reincarceration either (a) subjected him to double punishment in violation of his constitutional right to be protected from being placed in double jeopardy or (b) his parole was revoked in violation of his rights to substantive and procedural due process.

The background for this point must be gleaned from the facts acknowledged in the briefs of the parties. Succinctly stated, the facts are as follows. In 1980, before

his second conviction for killing Goss was vacated, the defendant was paroled to a detainer placed upon him by California. This was a parole from the sentence for killing Goss and by inference was a parole from a life sentence for killing Glover. Within three months he was paroled upon a life sentence in California. It was after that that an amended information in this case was filed and the instant trial held.

In respect to this point, in his brief the defendant acknowledges "[t]his issue was the subject of a habeas corpus proceeding in the Missouri Court of Appeals, Western District, styled *State ex rel. Douglas W. Thompson, Petitioner, v. Bill Armontrout, Superintendent, Missouri State Penitentiary, Respondent,* No. WD 36670." After opinion by that court, that proceeding was transferred to the Supreme Court of Missouri. In addition, the defendant filed a pro so petition in habeas corpus in the Supreme Court seeking relief upon the same basis. The Supreme Court denied the petition for a writ of habeas corpus in each proceeding. *State ex rel. Thompson v. Missouri Board of Probation and Parole,* No. 67252 (Mo. August 7, 1985); *State ex rel. Douglas W. Thompson v. Missouri Court of Appeals,* No. 67319 (Mo. September 16, 1985); *State ex rel. Douglas W. Thompson v. Bill Armontrout, Superintendent, Missouri State Penitentiary,* No. 67325 (Mo. September 16, 1985).

It is doubtful if the issue presented by this point is cognizable by this court upon this appeal. However, assuming that it is, accepting the defendant's acknowledgment, that issue has been decided adversely to the defendant by the Supreme Court. "When a petition for a writ of habeas corpus has been denied by a higher court, a lower court shall not issue the writ unless the order in the higher court denying the writ is without prejudice to proceeding in a lower court." Rule 91.22. A certified copy thereof discloses the decision of the Supreme Court was not without prejudice but was an adjudication on the merits. This court is bound by that adjudication. *Hicks v. State,* 719 S.W.2d 86 (Mo.App.1986). Defendant's fifth point is denied.

In conclusion, it must be noted the defendant tendered a pro se brief. By order, this court rejected that brief because it did not comply with the Rules. The defendant was advised of the deficiencies and given until November 18, 1985, to file a corrected pro se brief. He did not do so. The rejected brief is not before this court for consideration.

The defendant was permitted to file a pro se "Brief in Response", subject to a determination of whether it complies with the rules. It does not. However, as it is part of the record, it will be considered. In two numbered paragraphs he contends it was impossible that a bullet from his gun caused the death of Goss. He argues testimony of his position and posture and the position of Goss. He ignores the uncontroverted evidence that virtually simultaneously with the shot by Tucker there were flashes of two gun shots on the passenger's side of the Oldsmobile. It was then Goss cried out he was hit. While there was conflicting evidence, the defendant also ignores evidence such as the fact he slid from the Oldsmobile and that Goss was in a position to have been shot by the defendant. All the evidence established a bullet entered the right side of Goss' right leg and exited the left side of that leg and then entered the right side of his left leg and exited the left side of the left leg. For Goss to have been shot by Lang, Goss would have had to be standing with his back to the Oldsmobile. All the evidence was that Goss was facing the Oldsmobile directly or at an angle. The jury resolved the factual argument against the defendant.

The balance of the pro se brief attempts to state the issues raised by the brief filed in his behalf by his counsel. Those issues have been decided adversely to him. The judgment is affirmed.

PREWITT, P.J., and HOGAN and FLANIGAN, JJ., concur.